**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **MAHALA A. CHURCH, individually** | * | |
| **and on behalf of all similarly situated** | * | |
| **individuals,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | **CASE NO.: 1:14-00057-WS-B** |
| | * | |
| **ACCRETIVE HEALTH, INC.,** | * | |
| **aka, dba MEDICAL FINANCIAL** | * | |
| **SOLUTIONS,** | * | |
| | * | |
| **Defendant.** | * | |

_____

**MEMORANDUM IN OPPOSITION TO DEFENDANT'S (SECOND) MOTION TO
DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**
_____

**COMES NOW**, Plaintiff and, in opposition to the Defendant's Second Motion to Dismiss

or, in the alternative, Motion for Summary Judgment (Doc. 43), submits the following memorandum

and the documents attached hereto:

**FACTS AS ALLEGED IN AMENDED COMPLAINT**

**A.     Mrs. Church and her Medical Bill**

Mrs. Church is a retired hospital administrator and lives in Mobile County. She was a

hospital risk manager when she retired in 1999. Her main source of income is her Social Security

benefits and retirement. At all relevant times, her primary medical insurance was provided by

Medicare. She also owns a Blue Cross/Blue Shield supplemental policy. (Amended Complaint

(Doc. 41)("AC") ¶ 13)

On December 18, 2012, Mrs. Church had hip replacement surgery at Providence Hospital.

Between her Medicare and supplemental policy, 100% of the expenses of the surgery should have been covered.  At that point, Mrs. Church had satisfied all of her deductible requirements for 2012. She was discharged from Providence on or about December 20th.  However, Providence did not bill her insurance for the surgery until after January 1, 2013.  Sometime after that point, Mrs. Church received a bill from Providence demanding $1,944.80.  When Church called to find out why the full cost was not covered, she was told that she owed a deductible because the expense was not billed until after the first of the year.  Church disputed that she owed the deductible because the expenses were incurred during 2012.  In fact, under her contract with Providence and in accordance with the billing information provided to Mrs. Church when she was admitted to the hospital, all outstanding charges owed by the patient are due upon discharge from the hospital.  (AC ¶ 14).

In the meantime, Mrs. Church's daughter lost her job and relied on Church's financial support.  As a result, Church had trouble making ends meet and, on June 7, 2013 she filed a voluntary Chapter 7 bankruptcy petition. (AC ¶ 15).  Defendant was listed as a creditor and received notice of the bankruptcy filing.  Mrs. Church's bankruptcy was discharged on September 9, 2013 and the notice of that discharge was mailed to all her creditors, including Defendant, on September 11, 2013.  At all relevant times Accretive knew or should have known that Plaintiff, who had included the debt at issue in her Chapter 7 case, had received a discharge. (AC ¶ 16-18, 24).

**B.**   **Accretive, Inc., Accretive, LLC and Medical Financial Solutions**

Accretive Inc. was incorporated in 2003 as a "portfolio" company of Accretive, LLC, a private equity fund based on New York, N.Y.  According to the Minnesota Attorney General, by 2009 Accretive, LLC, through various holdings and transactions, took control of the nation's largest debt collection enterprise.  Among Accretive LLC's holdings was the much-maligned arbitration company, the National Arbitration Forum ("NAF").  NAF had been subject to numerous complaints

and lawsuits, including enforcement suits brought by the Minnesota Attorney General and the City of San Francisco.  In August 2009, three weeks after the Minnesota Attorney General suit was filed, NAF voluntarily shut down its consumer arbitration practice.  Shortly thereafter, various other debt collection ventures held by Accretive, LLC went out of business. (AC ¶ 7).

According to the Minnesota Attorney General, Accretive, LLC, became more involved in the medical debt collections in the time leading up to the collapse of its consumer arbitration business.  This was accomplished through its holding, Accretive Health, Inc.  Accretive Health incorporates its collections practice into the "revenue cycle" of local hospitals.  Through its agreement with local hospitals, Accretive "manages" the collection of accounts.  When debts become past due, the portion of the bills owed by the patient are transferred to Accretive's collection arm, Medical Financial Solutions (hereinafter "MFS").  Here is how Accretive described its business in its latest SEC filing: "Our integrated revenue cycle management service offering helps U.S. healthcare providers to more efficiently manage their revenue cycles, which encompass patient registration, insurance and benefit verification, medical treatment documentation and coding, bill preparation *and collections*."  With respect to that last role, Accretive operates under the name MFS. (AC ¶ 8-9).

Accretive recognizes that these collection activities are covered under the FDCPA.  After explaining the basic requirements of the FDCPA in  its 10-K report, Accretive acknowledged that "[c]ertain of our accounts receivable activities may be subject to the FDCPA."  (AC ¶ 9; Exhibit 3, p. 21). Accretive goes on to explain that it is licensed as a debt collector in those states that require such licensing. Id.[1]  In fact, Accretive and/or MFS is licensed as a debt collector in at least the

---

[1] Alabama does not require debt collectors based outside the state to obtain a specific license for debt collection activities.

following states: Texas, Florida, Illinois, Minnesota, Massachusetts and Washington. (AC ¶ 8). The collection activities of Accretive and MFS in those states is similar, if not identical, to the services Defendant performed for Providence Hospital with respect to Plaintiff.  (AC ¶ 8).

MFS has been sued numerous times in various federal courts, for violations of the FDCPA in connection with its  medical debt collection practices.  In at least three of these cases, MFS has admitted that it is a "debt collector" as defined in 15 U.S.C. 1692a(6). (AC ¶ 10)

## C.    The Debt Collection Actions Against Church

Mrs. Church was discharged from Providence Hospital on December 20, 2012.  Pursuant to Providence's publicly available billing practices and its contract with its patients, all outstanding charges owed by the patient are due upon discharge. (AC ¶ 14).  After she was discharged from Providence, Mrs. Church received at least one billing statement. As previously stated, Church disputed that she owed this amount.

Providence transferred Mrs. Church's account to MFS for collections on January 10, 2014. At that point, the account was over twelve months past due. (AC ¶ 19).

On or about January 17, 2014, Accretive initially contacted Plaintiff by collection letter demanding payment in the amount of $1,944.80. (See Exhibit 1).[2] The creditor was identified as Providence Hospital with a date of service of December 18, 2012.  In its collection letter, MFS stated  that "Providence Hospital has sent your account to MFS.  It is very important we hear from you."  The letter requested payment of the $1,944.80 balance in full and went on to describe various payment and assistance options.  MFS described itself as a  "non-credit reporting, third-party

---

[2]This letter was attached to the original Complaint and is referenced as an exhibit to the Amended Complaint. However, the letter was inadvertently omitted from the filed Amended Complaint.  Plaintiff will file the letter as an exhibit to the Amended Complaint.

agency." The letter goes on to state that "[o]ur company works directly with Providence Hospital to ensure your account is protected from moving further into collections." (AC ¶ 22).

The January 17, 2014 collection letter was the initial contact with Plaintiff and contained none of the disclosures required by the FDCPA and Plaintiff received no other communication or written notice within five days that complied with the statute. (AC ¶ 23).

Pursuant to Providence's billing policies, Medicare accounts are considered "bad debt," and by extension in "default," when they become more than 120 days past due. Mrs. Church's medical bills, or portions thereof, are covered by Medicare and her account is a "Medicare account" within the meaning of Providence's policies. (AC ¶ 14-20).

Even with respect to non-Medicare accounts, "default" occurs prior to the time the account is considered "bad debt" by Providence. (AC ¶ 21).

## LEGAL ARGUMENT

**A. ACCRETIVE'S MOTION TO DISMISS: PLAINTIFF HAS ADEQUATELY PLEAD ALL ELEMENTS OF HER FDCPA CLAIM**

### 1.    The Applicable Pleading Standard and Motion to Dismiss

The basic pleading requirements and standard of review under Rule 12(b)(6) is aptly summarized as follows:

> In most instances, the Federal Rules of Civil Procedure require only that the complaint provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a). Nevertheless, to survive a motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). The complaint must include enough facts "to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955. Pleadings that contain

nothing more than "a formulaic recitation of the elements of a cause of action" do not meet Rule 8 standards, nor do pleadings suffice that are based merely upon "labels or conclusions" or "naked assertion[s]" without supporting factual allegations. *Twombly,* 550 U.S. at 555, 557, 127 S.Ct. 1955. To be plausible on its face, the claim must contain enough facts that "allow [ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949.

[On Motion to Dismiss under Rule 12(b)(6)] [t]he court must construe pleadings broadly and resolve inferences in a plaintiff's favor. *Levine v. World Fin. Network Nat'l Bank,* 437 F.3d 1118, 1120 (11th Cir.2006). However, the court need not accept inferences that are unsupported by the facts asserted in the complaint. *Snow v. DirecTV, Inc.,* 450 F.3d 1314, 1320 (11th Cir.2006). Ultimately, the well-pleaded complaint must present a reasonable inference from the facts it alleges that show a defendant is liable. *Reese v. Ellis, Painter, Ratterree & Adams, LLP,* 678 F.3d 1211, 1215 (11th Cir.2012). To survive Defendants' Motion, the allegations of Plaintiffs' Complaints must permit the court based on its "judicial experience and common sense ... to infer more than the mere possibility of misconduct." *Iqbal,* 129 S.Ct. at 1949.

In re Blue Cross Blue Shield Antitrust Litig., 2014 WL 2767360 (N.D. Ala. June 18, 2014).  Mrs. Church's Amended Complaint contains detailed facts that support each element of her claims and easily meets the "plausibility" test.

## 2.    The Elements of a Claim under the FDCPA and the Amended Complaint

The FDCPA was enacted in order to "eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e).  If a consumer debt collector violates the FDCPA, the debt collector may be subject to civil liability for actual and/or statutory damages, plus attorneys fees and costs. 15 U.S.C. 1692k.  In the Eleventh Circuit, whether a debt collector's practices are false, deceptive, misleading or otherwise violate the FDCPA is determined from the point of view of the "least sophisticated consumer." Jeter v. Credit Bureau, Inc., 760 F.2d 1168, 1175 (11th Cir.1985);  Sparks v. Phillips & Cohen Associates, Ltd., 641 F. Supp. 2d 1234,

1243 (S.D. Ala. 2008).

In order to prevail on her FDCPA claim, Church must prove (1) that she is a "consumer" within the meaning of the statute; (2) that the Defendant is a "debt collector" within the meaning of the statute; and (3) that the Defendant has violated by act or omission at least one of the prohibitions or requirements set out in FDCPA. *See, e.g.*, <u>Creighton v. Emporia Credit Serv., Inc.</u>, 981 F. Supp. 411, 414 (E.D. Va. 1997).

Plaintiff adequately pled each of these elements. She alleges that she is a "consumer" as defined in the FDCPA (AC ¶ 5) and describes the medical debt which was subject of Defendant's collections efforts in detail (AC ¶¶ 14, 19-23). As described above, the Amended Complaint also includes detailed factual allegations relating to Defendant's status as a "debt collector," including the allegation that the debt was in default when it was assigned to MFS for collection and the facts surrounding that allegation. (AC ¶¶ 14-21). The Amended Complaint also alleges in detail how MFS collection letter violates the FDCPA by omitting the disclosures and information required by 15 U.S.C. 1692g. (AC ¶¶ 23). The Amended Complaint also alleges that the debt was discharged in bankruptcy, that Accretive knew or should have known that the debt was discharged when the MFS collection letter was mailed and that its attempts to collect a discharged debt constitute violations of the FDCPA. (AC ¶¶ 15-18, 24, 31).

Accretive attacks as insufficient the allegations regarding its status as "debt collector." Because Church's detailed factual allegations easily meet the *Twombly/Iqbal* "plausibility" standard, Accretive's Motion to Dismiss is due to be denied.

### 3.   Definition of "Debt Collector" under the FDCPA

The FDCPA's definition "debt collector" reads, in pertinent part, as follows:

The term "debt collector" means any person who uses any instrumentality of

interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another. Notwithstanding the exclusion provided by clause (F) of the last sentence of this paragraph, the term includes any creditor who, in the process of collecting his own debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts. . .. The term does not include–

(F) any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity . . . *(iii) concerns a debt which was not in default at the time it was obtained by such person*; . ..

815 U.S.C.A. § 1692a(6) (emphasis added).

Church alleges that Accretive is a "debt collector" because Providence referred the debt to MFS for collections after default.  "Default" is not defined in the FDCPA or any interpretive regulation.  In applying the term "default," for purposes of the debt collector definition, courts first look to any agreement between the original creditor and the debtor, or any applicable statutory or regulatory authority.  Prince v. NCO Fin. Servs., Inc., 346 F. Supp. 2d 744, 748 (E.D. Pa. 2004)(must first look to contract between creditor and debtor and any legal or regulatory authority); Hartman v. Meridian Financial Services, 191 F.Supp.2d 1031 (W.D.Wis. 2002) (relying on contractual provision stating default occurred when payment was missed); Skerry v. Massachusetts Higher Education Assistance Corp., 73 F.Supp.2d 47 (D.Mass.1999) (referring to regulatory definition applicable to student loan).  This approach is consistent with the position taken by the FTC's informal interpretive announcement.[3]

The courts and the FTC uniformly agree that "default" can not be determined unilaterally by arrangement between creditor and collector meant to circumvent FDCPA coverage.  *See, e.g.*,

---

[3]Letter from Thomas Kane, Attorney, U.S. Fed. Trade Comm'n, to Richard de Mayo, President & CEO, TSYS Total Debt Management, Inc. (May 23, 2002), available at http://www.ftc.gov/os/statutes/fdcpa/letters/demayo.htm.

Hartman, 191 F.Supp.2d 1031 (W.D.Wis. 2002) (rejecting definition of default in contract between creditor and collector); Winterstein v. CrossCheck, Inc., 149 F. Supp. 2d 466, 470 (N.D. Ill. 2001)(rejecting arrangement between creditor and collector which purported to assign account to collector at inception although collector was not involved in account until after it went to collections, characterizing the technique as "an effort to exalt form over substance).[4]

There are no binding decisions in this circuit defining "default" for purposes of the FDCPA. The case principally relied on by Accretive, Alibrandi v. Fin. Outsourcing Servs., Inc., 333 F.3d 82, 86 (2d Cir. 2003), is the leading circuit court opinion on the subject but it does not support Accretive's position. Alibrandi addressed the collection of sums owed after the termination of an automobile lease. Within a month after the lease terminated, the plaintiff was contacted by a third-party debt collector by letter stating that the account was in default and that the communication was from a debt collector. A couple of months later plaintiff was contacted by the defendant by letter stating that the account was not in default, but nonetheless requested immediate payment. The first letter contained the information disclosures required by the FDCPA, but defendant's letter did not. Using the Black's Law Dictionary of "default,"[5] the plaintiff argued that default occurs at the moment it becomes due and is unpaid. The Alibrandi court disagreed. The court observed that "courts have repeatedly distinguished between a debt that is in default and a debt that is merely outstanding, emphasizing that only after some period of time is an outstanding debt go into default."

---

[4]The Kane FTC letter referenced above states that in the absence of any other authority, it would look to a creditors "reasonable, written guidelines . . . to determine when an account is 'in default', as long as those policies were applied consistently, designed for a legitimate purpose and not for circumventing the FDCPA.

[5]Black's defines "default" as any "omission or failure to perform a legal or contractual duty." Black's Law Dictionary, Fifth Ed. 1979.

The court noted that "default" would be determined by any applicable legal standard and emphasized that any contractual agreement between creditor and debtor would be the primary determining factor.  Id, at 87 and n. 5.  However, the court also emphasized that "default" could not be determined by self-serving internal agreement between the creditor and a third-party collector.

> But if Alibrandi's debt was in default when Financial Outsourcing obtained it, Financial Outsourcing had no ability to change that status through an agreement with First Union. *The status of the debt would not have been alterable by the expedient of a letter agreement between First Union and Financial Outsourcing. Financial Outsourcing may sincerely have believed it was servicing a debt that was not in default, but that is irrelevant.*

Alibrandi, 333 F.3d at 88 (emphasis added).

Therefore, Alibrandi does not stand for the proposition that "default" can be determined by some self-serving arrangement between Accretive and Providence or by the Accretive and/or Providence's belief that the debt was "active" (whatever that means).  Going that far would allow collectors to circumvent the statute altogether through cleverly written arrangements with creditors.  The Court should reject this and any other interpretation of the FDPCA which would "limit the law severely and leave it open to easy evasion by simply adopting a different form of contract."  Kimber v. Fed. Fin. Corp., 668 F. Supp. 1480, 1485 (M.D. Ala. 1987).

It is important to remember that Church's claim does not hinge on whether the account was in "default" the moment it became past due (upon discharge from the hospital).  The key allegation (and all Church need prove) is that it became in default at some point prior to the January 2014 referral to MFS.  That said, at least one court has held that "default" occurs when a debt becomes "past due." Magee v. AllianceOne, Ltd., 487 F. Supp. 2d 1024 (S.D. Ind. 2007).  Magee addressed the collection of an outstanding balance due on an unsecured line of credit.  After several months of delinquency, the creditor referred the account to a third-party collector which sent a series of

collection letters demanding payment. The loan agreement granted the creditor a unilateral right to declare a default. Also, the contract between the creditor and the collector specified that accounts are not deemed to be in default until they are 180 days past due. The collector argued that it was not covered by the FDCPA, because the bank had never declared default and the account was not 180 days past due at the time the letters were written. The court refused to allow the creditor the unilateral ability to declare an account in default. The court reasoned that to do so would circumvent the purposes of the FDCPA because a creditor could refer a debt to a collector and then declare that debt in default the next day, thereby immunizing the collector from the FDCPA coverage. Instead, the court adopted the common definition of default as meaning a failure to perform a contractual duty and held that once that occurs and the debt is referred to an outside collection agency for collection, it is in "default" and the FDCPA applies. Id., at 1027-28.

Even assuming a debt is not in "default" when it becomes past due, the length of delinquency is a factor. McKinney v. Cadleway Properties, Inc., 548 F.3d 496, 501-02 (7th Cir. 2008)(a debt which was two years in arrears when it was assigned to third party was deemed by the court to be in default, even in the absence of the creditor's determination of default). Church alleges that the debt remained outstanding for over a year after it first became due and that at some point during that time and before referral to MFS it became in default. This is unquestionably plausible.

### 4. **Church Adequately Alleges Debt Collector Status**

Defendant's motion is premised on the argument that (1) Church failed to adequately plead that the account was in default and (2) could not possibly plead that the account was in default due to the language set out in MFS' January 17th letter. Both are wrong.

Mrs. Church alleged in her Complaint that Defendant was a "debt collector" under the FDCPA. More specifically, the Amended Complaint states that defendant is a "debt collector"

because it was assigned to Defendant after default. The Amended Complaint goes on to state in detail facts supporting that allegation, including that the account was transferred from Providence Hospital to Defendant on January 10, 2014, nearly 12 months after the debt first became due. (AC ¶¶ 19-20).

Church also alleged specifics about the medical debt and the insurance coverage. Her primary insurance is provided by Medicare. (AC ¶ 13). This is relevant to the "default" question because, as also pled by Church, Providence's bad debt policy treats Medicare accounts separately. (AC ¶¶ 20-21). Under the policy (at least the part that Accretive has allowed us to see), Medicare accounts are considered "bad debts" after 120 days past due. Church pleads that her account, 12-months in arrears, is considered "bad debt" and therefore in default by application of Providence's policy. (Id.). Defendant fails to address this aspect of the Amended Complaint at all, much less explain how this does not plausibly plead that the account was in default when it was assigned.

The Amended Complaint further alleges facts relating to Defendant's general business model, which it described in its SEC filings as subject to regulation under the FDCPA. Moreover, in at least three lawsuits involving alleged FDCPA violations stemming from the collection of medical debts, Defendant has admitted that it is a "debt collector" with respect to the above definition. Again, Accretive offers no explanation as to why these allegations do not render Church's claims plausible. It merely offers counter-arguments expressing its opinion that Accretive could have been a debt collector in one setting but not as to Church's debt. Such opining is immaterial for purposes of the motion to dismiss.

Accretive's argument that Church did not adequately plead a "default" boils down to Church's failure to specify the date on which she was first billed by Providence. (Doc. 44, p. 7). However, no explanation is given as to why this one omission renders the claim implausible given

the many details surrounding the debt and billing that were pled.  Accretive merely offers its opinion that she must have received a bill at some point after December 2012 discharge and prior to the January 17th MFS collection letter.  Though not fully explained, the apparent implication is that "default" could then not have been upon discharge.  But Accretive fails to explain why this fact, if it is a fact, renders the claim implausible.

Accretive's hyper-technical scrutiny has no place at the motion to dismiss stage. *Twombly/Iqbal* did not abolish notice pleading and does not require a "heightened fact pleading of specifics."  Twombly, 550 U.S. at 570.  All that is required is to plead enough facts to state a claim to relief.  Financial Sec. Assur., Inc. v. Stephens, Inc., 500 F.3d 1276, 1282 (11th Cir.2007); Caribbean I Owners' Ass'n, Inc. v. Great Am. Ins. Co. of NY, 619 F. Supp. 2d 1178, 1182 (S.D. Ala. 2008).  Church's alleges that debt was due upon the December 2012 discharge, that she received a bill after January 2013, and that the account was in default before it was transferred to MFS *one year later.*  These allegations render it more than plausible that the account was in default when it was referred.

### 4.    <u>Accretive's January 17th Letter Does Not Foreclose Liability</u>

Accretive insists that its January 17th collection letter "affirmatively demonstrates that the debt in question was not in default."  (Doc. 22, p. 13).  On that basis alone, Accretive argues that Plaintiff could not possibly plead a plausible claim under the FDCPA.  This position does not survive close examination of the letter.  Each aspect of that letter relied on by Accretive is discussed below.

#### i.    **Balance is "Active"**

Accretive first points to the letter's description of the account as having an "an active balance of $1944.80" has no bearing on "default."  The term "active" has no meaning under the FDCPA or

an applicable contract and Accretive points to no other authority explaining how "active" would negate "default." Such a conclusion contradicts common sense. For example, if a credit card payment is missed, the resulting balance could be considered "active" even though the account could be in "default" if the terms of that applicable agreement provided so. In any event, Accretive provides no basis in law or fact for why this Court should make the giant leap of equating an account with an "active balance" to an account not in "default."

      **ii.**      **MFS is a "Non Credit-Reporting, Third Party Agency"**

Then there is the description of MFS as a "non credit-reporting, third party agency." Nothing about that term would exclude MFS from the FDCPA's definition of "debt collector." Whether a collector reports to a credit bureau has no bearing on its status under the FDCPA. On the other hand, the term "third party agency" clarifies that MFS has been hired to collect the debts of another - an essential element of the FDCPA definition. In fact, the distinction creditors collecting their own debts and third-party collectors lies at the base of the "debt collector" definition. This distinction stems from a Senate report on abusive debt collection practices which found that creditors, who are presumably concerned about preserving their own good will, are inherently restrained in their collection efforts in order to preserve good will with the customer. On the other hand, the report found that the most abusive practices are attributable to third-party collectors who are not concerned about any long term relationship with the debtor or preserving goodwill. S. Report No. 95–382, 95th Cong., 1st Sess., *reprinted in* 1977 U.S.Code Cong. & Admin.News 1695; see also F.T.C. v. Check Investors, Inc., 502 F.3d 159, 173 (3d Cir. 2007); Schlosser v. Fairbanks Capital Corp., 323 F.3d 534, 536 (7th Cir. 2003). As provided in subsection (F)(iii), the Act would apply to any such third-party, as long as the debt was referred to it after default. Thus, if anything, the reference to MFS as a "third-party" would a finding that MFS was representing itself as a debt

collector.

###    iii.    Moving "Further Into Collections"

The final aspect of the letter relied on by Accretive is the statement that MFS "works directly with Providence Hospital to ensure that your account is protected from moving *further* into collections." (Emphasis added).   Accretive draws an unsupportable conclusion from this language: "were the debt already defaulted, it could not *possibly* 'mov[e] *further* into collections.'" (Doc. 22, p. 13)(emphasis added).   Well, why not?   Could not a defaulted account   in collections move "further" into collections if not paid?   After all, a defaulted account could be, and often is, subject to multiple levels of collections.   Collections on a defaulted account often starts with efforts in-house by the actual creditor.   If not paid, the account moves "further" to a hired third-party collector. If the collector's efforts fail, the account could be sold to a debt buyer for "further" collections. Three levels of collections - all on a *defaulted* account.

This scenario is not at all hypothetical.   In fact, it is a common progression of collection practices.   Here is a description of typical debt collection practices recently released by the federal Consumer Finance Protection Bureau:

> When a consumer defaults on a debt, the first efforts to collect on that debt are often made by the creditor itself, either through in-house collectors or others collecting in the name of the creditor. In either case, first-party collections are largely exempt from the FDCPA. . ..If the creditor or other owner of the debt decides not to collect on the debt itself, it may engage a third-party debt collector to try to recover on the debt in the collector's own name rather than in the name of the creditor or other owner of the debt. . ..

Preamble to Advance Notice of Proposed Rulemaking, Sec. IB, 78 Fed. Reg 67847 (Nov. 8, 2013).[6]

Accretive is playing a semantics game it can not win.   For the purposes of Church's FDCPA

---

[6] Available at https://federalregister.gov/a/2013-26875

claim, the import of the phrase "further into collections" will not be determined by the jousting between the two sets of attorneys, but by application of the "least-sophisticated consumer" standard. Crawford v. LVNV Funding, LLC, 2014 WL 3361226 (11th Cir. July 10, 2014); LeBlanc v. Unifund CCR Partners, 601 F.3d 1185, 1193 (11th Cir. 2010).

So, the question becomes whether "further into collections" could be interpreted by the least sophisticated consumer to mean that the account is now in collections, but could move further into collection if not paid.  Applying common usage of those terms, the answer is certainly yes.  Even a sophisticated consumer could reasonably conclude from the letter that MFS is a third party collector hired to collect the debt, that the debt was already in collections and would move further into collections if not paid.  After all, we would not ask a person to run "further down the field" if the runner was not already on the field in the first place.[7]  Similarly, an account can only move "further" into collections if it is already in collections.  The "least sophisticated consumer" could easily conclude from that language that her account has already been considered in "collections" (and in "default") from the warning that the debt could move "further" into  collections if not paid. What can be said for certain about this phrase is that it does not foreclose the possibility that the account was in default at the time.

Because the Amended Complaint sets out facts sufficient to render Accretive's liability under the FDCPA plausible, its Motion to Dismiss is due to be denied.

---

[7]If MFS meant to say that the account was not yet in collections, but would be placed in collections if unpaid, the English language provides a multitude of options.  For one, MFS could have simply added a comma after "further."  "Further, into collections" brings the phrase closer to the import Accretive now attaches to it.  But it can be reasonably assumed that by leaving the phrase as written, MFS meant to convey that the account was in collections, that it was a third-party hired for that purpose and that something bad would happen if the debt was not immediately paid.

**B.   ACCRETIVE IS NOT ENTITLED TO SUMMARY JUDGMENT**

Accretive moves in the alternative for summary judgment, asserting that undisputable facts establish that the account was not in default when it was transferred to MFS.  Accretive's request should be denied for two basic reasons.  First, the motion is premature as no discovery has been conducted.  Second, even if the Court were to consider the "evidence" submitted by Accretive, there is no showing of any undisputed fact that forecloses Plaintiff's contention that it is a "debt collector" under the FDCPA.

**1.   Accretive's Motion Is Premature**

A motion for summary judgment filed at the outset of the case, though technically allowed, is "procedurally suspect" and should be granted only in rare circumstances.  This Court succinctly summarized the applicable law as follows:

> Filing a Rule 56 motion at the outset of a case (before the commencement of discovery) is not forbidden under the Federal Rules of Civil Procedure; however, it is procedurally suspect, or at least discouraged. The law of this Circuit provides that, as a general proposition, "the party opposing a motion for summary judgment should be permitted an adequate opportunity to complete discovery prior to consideration of the motion." *Jones v. City of Columbus, Ga.,* 120 F.3d 248, 253 (11th Cir.1997) (citations omitted); *see also Dean v. Barber,* 951 F.2d 1210, 1214 (11th Cir.1992) ("A party opposing summary judgment should be given the opportunity to discover information relevant to the summary judgment motion."); *Snook v. Trust Co. of Georgia Bank of Savannah, N.A.,* 859 F.2d 865, 870 (11th Cir.1988) ("summary judgment should not be granted until the party opposing the motion has had an adequate opportunity for discovery"); *Baucom v. Sisco Stevedoring, LLC,* 506 F.Supp.2d 1064, 1067 n. 1 (S.D.Ala.2007) (reciting general rule). Thus, "[i]f the documents or other discovery sought would be relevant to the issues presented by the motion for summary judgment, the opposing party should be allowed the opportunity to utilize the discovery process to gain access to the requested materials." *Snook,* 859 F.2d at 870. Where district courts fail to honor these principles, appellate courts have found error. *See, e.g., Jones,* 120 F.3d at 253 (district court abused its discretion in deciding summary judgment motion where plaintiffs never had opportunity to examine requested documents or to depose defendant's witnesses); *Dean,* 951 F.2d at 1213–14 (district court abused discretion by granting summary judgment for defendant without ruling on plaintiff's motion to compel, such that summary judgment was entered on potentially inadequate record).

-17-

Sideridraulic Sys. SpA v. Briese Schiffahrts GmbH & Co. KG, 2011 WL 3204521 (S.D. Ala. July 26, 2011).

Accretive's motion illustrates why pre-discovery summary judgments are disfavored. The absence of discovery in this case allows Accretive to cherry pick from evidence available only to itself the "facts" supportive of its argument. For example, Ms. Bragg's affidavit references Providence's "billing policies and practices." This is no doubt a voluminous set of written policies. Yet, Accretive has allowed the Court to see only the three-page section addressing "bad debts." Accretive has decided not to unveil the rest of Province's policies and procedures applicable to collections; nor has Accretive revealed its contract with Providence.  For all we know at this point, that policy may contain a detailed description of when Providence considers an account in default. Any determination prior to allowing discovery into the entire policy and other relevant documents allows Accretive the unilateral ability to decide what the Court sees and what it does not.  Even the publicly available information referenced in Amended Complaint demonstrates that there is "more to the story" than Accretive's self-serving descriptions of its role in hospital collections.  If, as Accretive argues here, its role in hospital collections could never rise to a "debt collector" status then why is it licensed as a debt collector in the states that require such licensing? Why does it describe its practices as potentially subject to regulation under the FDCPA in its SEC filings? Why has it admitted to being a "debt collector" under Section 1692a(6) in other cases addressing similar practices? The parties should be afforded an opportunity to conduct discovery into these matters before a summary judgment motion from either side is entertained.[8]

---

[8]The previously filed Rule 56(d) Affidavit (Doc. 35) describes the need for discovery and is incorporated  as part of Church's response to Accretive's motion.

2.      **Accretive's "Evidence" Does Not Foreclose Its Status as "Debt Collector"**

Although Accretive's motion is procedurally premature and due to be denied on that basis

alone, Plaintiff is compelled to point out that "evidence" relied on by Accretive falls well short of

foreclosing, as a matter of law, it's status as a "debt collector."

Accretive's motion is premised on three "facts" which it argues undisputably establish the

non-default status of the account:

> (1)    MFS "specifically identified itself as" work[ing] directly with' the creditor regarding
> an account which was still 'active' with the creditor." (Doc. 22, p. 19);
>
> (2)    That, based on the affidavit of Donna Bragg, it is undisputed that "separate
> collections agencies handle the collection of Providence Hospital's defaulted patient
> accounts." Id; and
>
> (3)    That Providence's "Bad Debt policy" conclusively establishes that this account was
> not in "default" because it is not been converted to "bad debt."

Accretive fails to demonstrate how any of these "facts" preclude its liability.  Each is

discussed in turn.

a.      **The "Working Directly With" Statement**

Whether MFS works "directly with" a creditor regarding an account deemed "active" has

no bearing on whether that account was in default at the time it was referred. The term "active" has

no meaning within the FDCPA.  Morevoer, a collector's status under that statute can not hinge on

its unilateral that labeling, but instead is determined by the true nature of the debt. Alibrandi, 333

F.3d at 88; Hartman, 191 F.Supp.2d 1031 (W.D.Wis. 2002) (rejecting definition of default in

contract between creditor and collector).  Likewise, whether a debt collector is still "working with"

a creditor has no bearing on its status under the FDCPA.  After all, a  collector who has been

referred a defaulted account for collections may still "work with" the creditor in, for example,

obtaining information needed to properly identify and locate the debtor, or to  gather the evidence

necessary to establish the default in court.  That arrangement would nevertheless fall within the scope of the FDCPA.

### d. The Statement Regarding "Separate Collections Agencies"

According to Accretive, the Bragg Affidavit establishes as undisputed fact that Providence hires "separate collections agencies handle the collection of Providence Hospitals' defaulted patient accounts." (Doc. 22, p. 19).  But that does not foreclose the claim that the accounts referred to MFS are also in default.  Bragg states that MFS is hired to "exhaust all possible collection efforts and determine that the account is uncollectible or that the account should be referred to a commercial collection agency."  Bragg Aff., ¶ 8.   Neither Bragg nor Accretive explain how "all possible collection efforts" can be exhausted and yet the account not be considered in default.  Importantly, Bragg points to no written definition of "default."  She also offers no explanation as to how Mrs. Church's 12-month old unpaid hospital bill is not considered in default when it was referred to MFS. Bragg's conclusion that Church's account was "never considered in default" is hearsay, not supported by any aspect of Providence's written policies and is undercut by the one slice of Providence's written policy that Defendant chose to reveal (see below).  In short, whether or not other agencies are employed to collect debt has no bearing on whether this account was in default on January 10, 2014 when it was referred to MFS for collections.

### e. Church's Account is a "Bad Debt" under Providence's Policy

According to Bragg, an account is "active" and considered not in default until it is converted to a "bad debt" pursuant to Providence's written policy.  As explained in the next section, that statement defies logic and the common definition of "bad debt."  More importantly, a review of that policy shows that Church's account actually qualified as "bad debt" when it was referred to MFS. Therefore, even under Bragg's interpretation the account would be in default at the time.

Providence's definition of "bad debt" includes any "Medicare account" which is more than 120 days past due. (Doc. 46-1, p. 2). As stated above and as alleged in the Amended Complaint, Mrs. Church's primary insurance is provided through Medicare. Presumably, her debt would be considered a "Medicare account" under Providence's policy. If so, Bragg's statement that an account is not in "default" unless it qualifies as "bad debt" establishes that Church's account was considered in default in January 2014 when it was referred to MFS. At a very minimum, this emphasizes the need for further discovery into Providence's policies and the nature of Church's debt.

  **f.**  **"Bad Debts"**

The term "Bad Debt" is an accounting term referring to debt which has been deemed uncollectible and may be deducted from a businesses income for tax purposes. The Internal Revenue Service defines bad debt as follows:

> You have a bad debt if you cannot collect money owed to you. . .. Business bad debts are mainly the result of credit sales to customers. Goods that have been sold, but not yet paid for, and services that have been performed, but not yet paid for, are recorded in your books as either accounts receivable or notes receivable. *After a reasonable period of time, if you have tried to collect the amount due, but are unable to do so, the uncollectible part becomes a business bad debt.*

IRS Publication 535, Chapter 10 (May 10, 2014), excerpts of which are attached hereto as Exhibit 7. In the context of medical bills, federal regulations define "bad debt" as follows:

> Bad debts are amounts considered to be uncollectible from accounts and notes receivable that were created or acquired in providing services. "Accounts receivable" and "notes receivable" are designations for claims arising from the furnishing of services, and are collectible in money in the relatively near future. . .
>
> A bad debt must meet the following criteria to be allowable:
>
>  (1) The debt must be related to covered services and derived from deductible and coinsurance amounts.
>
>  (2) The provider must be able to establish that reasonable collection efforts were made.

(3) The debt was actually uncollectible when claimed as worthless.

(4) Sound business judgment established that there was no likelihood of recovery at any time in the future.

42 C.F.R. § 413.89.  See also, <u>Vitality Rehab, Inc. v. Sebelius</u>, 641 F. Supp. 2d 984, 988 (C.D. Cal. 2009).

Thus, the "bad debt" designation comes at the end of the collection process and certainly after there has been a default.  If fact, the collections efforts that must take place before writing a debt off as "bad" must take place after a default.  This write-off can only occur after reasonable collection efforts have been exhausted and the account is deemed "uncollectible" or "worthless." This conflicts with Accretive's position that a debt does not become in "default" until it is a "bad debt."  In order to become a "bad debt" the business is required to exhaust reasonable collection efforts.  In fact it is this very process that MFS is hired to assist in.[9]   It defies logic to say that collections efforts can be "exhausted" and yet the debt not yet be in "default" for purposes of the FDCPA.  Consider this: the "reasonable collection efforts" which must take place before a "bad debt" write would certainly include (if not require) a lawsuit, assuming the collection suit is viable. Necessarily, the debt would have to be in default in order for such a suit to be brought.  This is just one illustration of the reality that default must occur, if not when it becomes due, certainly at some point during the collections process and *before* an account can been deemed "bad debt."  Allowing a collector or its client to wait until the end of the collections process to declare a debt in default would exempt all the collections efforts prior to the bad debt charge-off from FDCPA coverage, even if a third-party agency is hired.  This level of manipulation has been rightly rejected by courts

---

[9]According to Bragg, MFS is hired to "exhaust all possible collection efforts and determine that the account is uncollectible or that the account should be referred to a commercial collection agency."  Bragg Aff., ¶ 8.

facing similar schemes and should likewise be rejected here.

> ### g.        The Cases Relied On by Accretive

The cases relied on by Accretive in its summary judgment argument are distinguishable and do not support its position.  Healy v. Jzanus Ltd., 2006 WL 898067 (E.D.N.Y. Apr. 4, 2006), involved the collection of medical debt, but differs in significant ways to the case at bar.  Healy addressed medical debt, the bulk of which was ultimately paid by Medicaid.  For nearly 12 months after the services were provided, the hospital sent plaintiff statements showing a zero balance owed.  The defendant, hired by the hospital for billing assistance, sent a letter about six months after discharge.  That letter also described her account as having a zero balance and did not demand payment.  It was undisputed that the defendant did not demand payment from plaintiff until after the insurance issues were resolved -  several months after the defendant first contacted Healy.  Plaintiff argued that the account was in default when she was first contacted by the third-party, even though no demand for payment was made and the account showed a zero balance at that time.  Also, the hospital-patient agreement specified that a balance owed by the patient is not due until the hospital provides notification to the patient.  The court granted summary judgment holding that the debt was not in default when defendant first contacted Healy.  The court also reviewed the  agreement between defendant and the hospital and concluded that defendant was not hired to collect defaulted debt.  Id., at slip op. p. 3-5.  Here, there is no question that MFS demanded payment and that the account was not referred until it was over a year in arrears.  Moreover, Defendant chose not to submit its agreement with Providence, leaving the Court no basis to conclude exactly what it was hired to do.  Finally, the arrangement between Providence and its patients, unlike in Healy, does not appear to require any notification in order to render an account due.   According to Providence, payment owed by patient is due upon discharge. (Exhibit 1).

Gould v. ClaimAssist, 876 F. Supp. 2d 1018 (S.D. Ill. 2012), also addresses hospital debt. In that case, Gould received a letter from the third-party, "ClaimAssist," which expressly stated that it was working to assist the hospital in preparing the plaintiff's medical insurance claim. The court was also presented with detailed testimony demonstrating that the hospital hired ClaimAssist for the sole purpose of assisting with third-party-payor claims. Once that process is complete, the hospital hires a different company to collect any amounts owed by the patient. At the time ClaimAssist contacted Gould, the hospital was still processing the insurance claim and had not referred the account for medical billing. Here, Accretive presents no evidence that MFS' role is limited to assisting with medical billing and we have no details on the billing procedure. There is only the bare-bones statement by Mrs. Bragg that the account was referred to MFS for "Pre-collections" of "unpaid an outstanding patient account balances." We are left to guess what those terms mean in the context of the agreement between Defendant and Providence. However, we know "pre-collections" means at a minimum sending a collections letter demanding payment on a debt that is 12 months past due. Unlike in Gould, Defendant presents no basis for this Court to conclude that Church's account was not in "default" when it was referred to MFS.

Prince v. NCO Fin. Servs., Inc., 346 F. Supp. 2d 744, 745 (E.D. Pa. 2004), is likewise distinguishable. That case involved a detailed credit card agreement which specifically defined the events of default and the plaintiff provided no evidence that these events have been triggered at the time she was contacted by the defendant. Id., at 749-50. Here, there is no such contractual stipulation. To the contrary, the information available indicates that the account was due upon discharge and Defendant has failed to produce any contrary contractual authority.

-24-

**B.     THE DISCHARGE VIOLATION CLAIM**

Accretive claims that Count Two of the Complaint should be dismissed because, although contempt is the correct remedy, a separate action can not be brought in this District Court to pursue the contempt claim.   The fundamental problem with this argument is that it incorrectly presumes that Church's Section 524 claim has been brought in a *separate* court.  The bankruptcy court from which Church's claim arises is within this District and is, for all relevant purposes, the same court. Moreover, decisions from this District, and others, confirm that an individual separate claim for contempt remedies, even if accompanied by a district-wide class claim, is an appropriate mechanism to address contempt.

There are private remedies for violations of discharge orders entered pursuant to 11 U.S.C. § 524. In Jove Eng'g, Inc. v. I.R.S., 92 F.3d 1539, 1554 (11th Cir. 1996), the Eleventh  Circuit, "determined that § 105(a) grants an independent statutory source for monetary relief[.]" Citing Jove, the court in Maddox v. Auburn Univ. Fed. Credit Union, 441 B.R. 149 (M.D. Ala. 2010) stated, "[t]his court is not without authority to consider and dispose of an action for contempt of a statutory injunction arising out of a case in the bankruptcy court of this district." Id., at 152. Accretive challenges Church's ability to bring her claims as a separate lawsuit filed in District Court.  While a motion under Rules 9020 and 9014 is the traditional way to bring an action for contempt, "courts routinely hear contempt actions brought as adversary proceedings."  Motichko v. Premium Asset Recovery Corp., 395 B.R. 25, 32 (Bankr.N.D.Ohio 2008); *See also*, In re Kilbourne, 507 B.R. 219, 223 (Bankr. S.D. Ohio 2014);  Brannan v. Wells Fargo Home Mortgage, Inc., 485 B.R. 443, 455 (Bankr.S.D.Ala.2013).

In Brannan, Judge Mahoney thoroughly addressed the propriety of a separate claim for contempt remedies under the Bankruptcy Code.  In that case, Judge Mahoney certified a district-

wide class addressing alleged wide-spread filing of fraudulent mortgage-related documents by Wells Fargo. The individual and class claims were brought a adversary proceedings in the Bankruptcy Court. Wells Fargo argued (as does Accretive here) that the claims should have been addressed as motions brought in the bankruptcy cases and not as individual lawsuits (in that case, adversary proceedings). The court found that contempt claims were appropriately filed as adversary proceedings. Here is the relevant discussion from that opinion:

> Wells Fargo asserts that, if this is a civil contempt action, it must be brought by motion. As stated above, this is a civil, not a criminal, matter. Rules 9020 and 9014 state that a civil contempt action should be brought by motion. However, the court concludes that this adversary case is not improper in these circumstances.

>> [C]ourts routinely hear contempt actions brought as adversary proceedings. *See, e.g. Laws v. First National Bank of Marin,* 2007 WL 1121266, 2007 Bankr.LEXIS 1352. Because the complaint in *Laws* requested that "the Court impose such penalties that this Court would find appropriate," the *Laws* court denied the defendant's motion to dismiss on the issue of sanctions payable to the court for violation of the discharge injunction, even though the debtors admitted that defendant's conduct had not caused them to suffer any actual damages. *Laws,* 2007 WL 1121266, *3, 2007 Bankr.LEXIS 1252 at *9. *See also, Lohmeyer,* 365 B.R. at 754 (allowing debtors to amend complaint to include allegations of actual injury); *Schramm v. TMS Mortgage, Inc. (In re Schramm),* No. 01–11026, 2006 Bankr.LEXIS 4470 (Bankr.N.D.Ohio, July 6, 2006) (denying motion to dismiss counts pertaining to violation of the discharge injunction); *Braun v. Champion Credit Union (In re Braun),* 152 B.R. 466 (N.D.Ohio 1993) (affirming bankruptcy court's imposition of sanctions against creditor for violation of the discharge injunction); and *Beck v. Gold Key Lease, Inc. (In re Beck),* 272 B.R. 112, 114(Bankr.E.D.Pa.2002) (holding "that Plaintiff does not have a private right of action under § 524, [but] dismissal ... [was] not warranted because Plaintiff has also alleged that [creditor] should be held in civil contempt for violating the discharge injunction").

>> To dismiss on procedural grounds alone would be to elevate form over substance. This is particularly true where—as here—an adversary proceeding provides more procedural protection for the defendant than does a contested matter brought by way of motion. *See, e.g., Beck,* 272 B.R. at 130. Furthermore, "even when filed as a

> motion, a contempt action can be handled in the same procedural manner as an adversary proceeding should a court so choose." *Id. See also, In re Bryant,* 340 B.R. 569 (Bankr.N.D.Tex.2006) ( "A bankruptcy court has discretion to treat a contested matter as an adversary proceeding [pursuant to Fed. R. Bankr.P. 9014(c) ].") Given that this Court has the discretion to require the more structured discovery process of an adversary proceeding in a contested matter, the Court sees no reasons to require Debtors to dismiss this adversary proceeding and refile it as a contested motion. Such unnecessary "hoop jumping" would merely serve to increase the costs of litigation, without providing any real benefit to either party.

In re Motichko, 395 B.R. 25, 32–33 (Bankr.N.D.Ohio 2008).

> Wells Fargo actually has more protection of its rights in an adversary proceeding due to all of the time and procedure safeguards in Fed. R. Bankr.P. 7001–7087. Also, Rule 9014(c) allows a court to apply any or all of the adversary rules to a motion as well.

In re Brannan, 485 B.R. 443, 455 (Bankr. S.D. Ala. 2013) leave to appeal denied, MISC.A. 13-0001-WS, 2013 WL 838240 (S.D. Ala. Mar. 5, 2013) and motion to certify appeal denied, 02-16647, 2013 WL 1352350 (Bankr. S.D. Ala. Apr. 3, 2013).

A similar result was reached in In re Williams, 244 B.R. 858, 867 (S.D. Ga. 2000), and was affirmed by the Eleventh Circuit, *sub nom.* in Williams v. Sears Roebuck, Co., 34 F. App'x 967 (11th Cir. 2002).  Williams involved individual and class claims brought in Bankruptcy Court for violation of Section 524 relating to reaffirmation agreements.  The court concluded that those claims could be pursued as a separate class action, as long as the class was restricted to the district.

> Plaintiff seeks both monetary and equitable class-wide relief for himself and similarly situated discharged debtors for Defendant's violation of § 524. Violations of § 524 can be remedied only by contempt proceedings pursuant to 11 U.S.C. § 105. Hardy v. United States, 97 F.3d 1384, 1388–90 (11th Cir.1996). Only "the court whose order has been defied," however, has jurisdiction to "entertain the contempt action." Pereira v. First North American National Bank, 223 B.R. 28, 31 (N.D.Ga.1998) (citing Klett v. Pim, 965 F.2d 587, 590–91 (8th Cir.1992); Lubrizol Corp. v. Exxon Corp., 871 F.2d 1279, 1290 (5th Cir.1989); Dunham v. United States, 289 F. 376, 378 (5th Cir.1923)). The Court, therefore, lacks jurisdiction to enforce violations of § 524's discharge injunction under § 105 through civil contempt

proceedings unless the debtor received his discharge from the Southern District of Georgia. Accordingly, Defendant's motion to dismiss Count II of Plaintiff's Amended Complaint will be GRANTED with respect to the damages claims of all members of the putative class who did not receive a discharge from this district, but will be DENIED with respect to those who did.

In re Williams, 244 B.R. 858, 867 (S.D. Ga. 2000) *aff'd sub nom.* Williams v. Sears Roebuck, Co., 34 F. App'x 967 (11th Cir. 2002).

Church's Section 524 claim can be brought as a separate action, as opposed to a motion for contempt. Therefore, there is no basis for Accretive's position that the same claim can not be brought as a separate claim in the District Court. The principal cases cited by Accretive address bankruptcy-related actions filed outside the district in which the bankruptcy case was filed. In Alderwoods Grp., Inc. v. Garcia, 682 F.3d 958 (11th Cir. 2012), the debtor filed a bankruptcy case in Delaware and received a discharge. After a creditor sued the discharged debtor in Florida state court, debtor filed an action for contempt in Bankruptcy Court in the Southern District of Florida. The court found that the Florida bankruptcy court had no jurisdiction. Alderwoods stands for the unassailable rule that, "the court that enters an injunctive order retains jurisdiction to enforce its order[.]" Id., at 970. Similarly, Pertuso v. Ford Motor Credit Co., 233 F.3d 417 (6th Cir. 2000), addressed a class action filed in federal district court in Michigan for violation of a discharge order issued in a Rhode Island bankruptcy court. The court found there to be no jurisdiction.

Here, Plaintiff is asking this Court to enforce the discharge order issued in its own district. It is axiomatic that this District Court has original jurisdiction of "all civil proceedings arising under Title 11, or arising in or *related to* cases under Title 11." 28 USC. § 1334(a). Bankruptcy judges in this District have authority to hear bankruptcy cases pursuant to an order of referral made under the Federal Judgeship Act of 1984, 28 USC §§ 151-158. A copy this District's referral Order is attached hereto at Exhibit 2.

Because Accretive has provided no basis for why the Court does not have jurisdiction over the discharge violation claim, its motion to dismiss Count Two is due to be denied.

## **CONCLUSION**

For all the reasons stated above, Accretive's Motion to Dismiss or, in the alternative, for Summary Judgment is due to be denied.

> /s/ *Kenneth J. Riemer*
> KENNETH J. RIEMER
> EARL P. UNDERWOOD
> Attorneys for Plaintiff
> Underwood & Riemer, P.C.
> P. O. Box 1206
> Mobile, AL 36633
> Telephone: 251-432-9212
> Fax: 251-990-0626
> E-mail: kjr@alaconsumerlaw.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 12, 2014, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System which will send an electronic notification of such filing to counsel of record.

> /s/ *Kenneth J. Riemer*
> KENNETH J. RIEMER