**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **MAHALA A. CHURCH, on behalf of herself and all others similarly situated,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION 14-0057-WS-B** |
| ) | |
| **ACCRETIVE HEALTH, INC., aka dba MEDICAL FINANCIAL SOLUTIONS,** ) | |
| ) | |
| **Defendant.** ) | |

**ORDER**

This matter comes before the Court on defendant Accretive Health, Inc.'s Motion for Summary Judgment (doc. 91). The Motion has been briefed and is now ripe for disposition.[1]

**I.     Motions to Seal.**

Before turning the Rule 56 Motion, the Court examines a quartet of Motions to Seal (docs. 93, 102, 105 and 109), through which the parties endeavor to place under seal their entire summary judgment briefs and the vast majority of the accompanying exhibits. As grounds for such a request, the parties contend that these filings "refer[] extensively" to matters marked "confidential" in discovery pursuant to protective order, that "much" of the information so designated "relates to personal health information," and that these filings also contain "highly confidential and proprietary information" relating to the "operations, business model and financial information" of the defendant and/or nonparty Providence Hospital.

---

[1]     Movant has requested oral argument. Review of the papers confirms that the parties have devoted in the aggregate more than 70 pages of briefing to a singular, narrow legal issue on largely undisputed facts. Moreover, the parties have already been heard once in this very case via another, similar set of briefs addressing precisely the same narrowly circumscribed legal question, albeit without the benefit of a developed factual record. Under the circumstances, oral argument would serve no constructive purpose; therefore, the Court in its discretion **denies** defendant's request. *See* Civil L.R. 7(h) ("In its discretion, the Court may rule on any motion without oral argument.").

Of course, federal courts have long recognized a strong presumption in favor of allowing public access to judicial records. *See, e.g., Chicago Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1311 (11th Cir. 2001) ("The common-law right of access to judicial proceedings, an essential component of our system of justice, is instrumental in securing the integrity of the process. … [T]he common-law right of access includes the right to inspect and copy public records and documents."). "Indeed, the common law right of public access to judicial documents is said to predate the Constitution." *United States v. Byrd*, 11 F. Supp.3d 1144, 1148 (S.D. Ala. 2014) (citation and internal marks omitted). The presumption of access extends to "[m]aterial filed in connection with any substantive pretrial motion, unrelated to discovery," and to any "motion that is presented to the court to invoke its powers or affect its decisions." *Romero v. Drummond Co.*, 480 F.3d 1234, 1246 (11th Cir. 2007) (citations and internal quotation marks omitted). "Litigants may not override that presumption by simply referencing a protective order." *Allstate Ins. Co. v. Regions Bank*, 2015 WL 4073184, *2 n.3 (S.D. Ala. July 2, 2015); *see also Suell v. United States*, 32 F. Supp.3d 1190, 1192 (S.D. Ala. 2014) ("[t]the mere existence of a protective order does not automatically override the public's right of access").

The parties' proffered justifications for the extraordinary "seal-everything" remedy they seek are too general, too conclusory, and altogether too skeletal. Inspection of the briefs and exhibits reveals minimal discussion of personal health information. While certain of Church's medical information and billing records are included, she has not requested that such materials be sealed to protect her privacy interests; rather, it is defendant that appears to be leading the charge on the Motions to Seal.[2] And the blanket assertion that across-the-board sealing is appropriate to safeguard "highly confidential and proprietary information" relating to the business practices of defendant and Providence Hospital appears to be breathtakingly overbroad. Not every internal billing procedure or policy of a company is automatically rendered "highly confidential and proprietary." Not every page from a company's internal policy manual is a

---

[2] To the extent that billing records concerning other patients have been included, it appears that the requisite spreadsheet exhibits have redacted patient names and other identifiers, such that there would be no "personal health information" justification to maintaining sealed status for those exhibits. And the few billing letter exhibits that recite names of other consumers could be easily redacted because those consumers' identities are unimportant to the issues joined in this action.

trade secret that would confer an unfair advantage to competitors if placed in the public file. And not every word that a deponent utters in deposition testimony concerning corporate practices and interactions between a hospital and its vendors is necessarily so sensitive and proprietary that the public's right of access must yield. Yet that is essentially all the parties have said – in sweeping, blanket, non-specific terms – to justify their Motions to Seal.

Upon scrutiny of the materials in question, the Court has no doubt that these filings do, indeed, divulge commercially sensitive information that Providence Hospital and/or Accretive Health may have a legitimate interest in shielding from the public. For example, the inner workings (and, specifically, the financial terms) of the Providence / Accretive contractual relationship may well be commercially sensitive, thereby justifying sealed status. However, the Court also has no doubt that the universe of information and documents as to which any legitimate sealing interest under Rule 26 exists is considerably smaller than the parties have represented via their "seal-everything" philosophy.

As the party seeking to have all briefs and hundreds of pages of supporting exhibits restricted from public access,[3] Accretive Health bears the burden of making a particularized showing that the Rule 26 good cause balancing test is satisfied with respect to each sealed item. *See, e.g., Suell*, 32 F. Supp.3d at 1192 ("The governing standard must be applied by the plaintiffs to each document, and to each portion of each document, separately."); General L.R. 5.2(b)(2)(B) (motion to seal must articulate "[t]he basis upon which the party seeks the order, including the reasons why alternatives to sealing are inadequate"). If Accretive Health really wishes to pursue sealed status for every word in every summary judgment brief, plus dozens of exhibits spanning hundreds of pages, then it must make a particularized showing, on a document-by-document basis (and even more disaggregated than that, as to briefs or exhibits covering multiple categories of information), why Accretive Health's, Providence Hospital's or a patient's

---

[3] By all appearances, Church's sole reason for requesting sealed status of her summary judgment submission was to accommodate Accretive's wishes. *See* doc. 102 (justifying plaintiff's Motion to Seal by saying that "Accretive has filed a motion," that information is included "which Accretive says is highly confidential and proprietary" and that plaintiff is filing under seal "based on … Accretive's representation that there is no alternative means to protect against the disclosure of the information it deems confidential"). Nothing before the Court suggests that Church independently seeks to have anything sealed; rather, her request seems derivative of, and animated exclusively by, Accretive Health's hardline stance.

interest in keeping that item/information sealed outweighs the public's right of access.  To date, it has not done so, and the Motions to Seal in their present form appear overinclusive to the extreme.

In short, the parties' proposed kneejerk "seal-everything" approach, while perhaps expedient, is incompatible with *Chicago Tribune*, Rule 26, General L.R. 5.2, and this Court's obligation to preserve the public's right of access to court proceedings absent a specific showing that overriding private interests exist.  Accordingly, Accretive Health is **ordered** to file a supplemental brief, on or before **December 8, 2015**, setting forth in detail, on an item-by-item basis, precisely which materials and categories of information it is claiming should be sealed, identifying the specific grounds for that contention, and specifying the reasons why redaction or other lesser measures are insufficient to protect those private interests in secrecy.  Once Accretive Health has identified the specific items and categories of information that it, Providence or Church has a legitimate interest in keeping confidential, an appropriate remedy can be fashioned to safeguard those private interests while preserving the public's right of access to the maximum extent practicable.

## II.    Background.[4]

### A.    Nature and Procedural History of the Action.

Despite the voluminous briefs and evidentiary submissions by the parties on summary judgment, this case is actually straightforward.  Plaintiff, Mahala A. Church, received medical treatment at a hospital in late 2012.  More than a year later, Church received a letter from defendant, Accretive Health, Inc., stating that she had an active balance of slightly below $2,000 and requesting payment.  That letter lacked certain disclosures prescribed by the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692 *et seq.* ("FDCPA").  In her Second Amended

---

[4]      The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party.  *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007).  Thus, plaintiff's evidence is taken as true and all justifiable inferences are drawn in her favor.  Also, federal courts cannot weigh credibility at the summary judgment stage.  *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) ("Even if a district court believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices.").  Therefore, the Court will "make no credibility determinations or choose between conflicting testimony, but instead accept[s] [plaintiff's] version of the facts drawing all justifiable inferences in [her] favor."  *Burnette v. Taylor*, 533 F.3d 1325, 1330 (11th Cir. 2008).

Complaint (doc. 81), Church brings a putative class action against Accretive Health.  The sole cause of action advanced in plaintiff's pleading is a claim that Accretive Health violated the FDCPA by "[f]ailing to make the disclosures required by 15 U.S.C. §§ 1692e and 1692g."  (Doc. 81, ¶ 35(a).)

For its part, Accretive Health denies liability to Church, on the ground that the subject disclosures were not required because of a FDCPA exemption for "debt which was not in default at the time it was obtained."  The <u>only</u> issue presented on summary judgment – and, indeed, the only triable issue joined in this case – is whether Accretive Health's letter concerned a debt that was in default.  Church says it did.  Accretive Health says it did not.  Defendant's Rule 56 Motion hinges on resolution of that singular, narrow legal question.  If the debt was not in default, as movant argues, then Church's FDCPA claim fails as a matter of law and this action is properly dismissed.  If, however, genuine issues of material fact exist as to whether Church's debt was in default, then this action must proceed to disposition of plaintiff's pending class certification motion and a trial on the merits.

The pending Motion for Summary Judgment, which defendant filed following the close of discovery, marks the second time the "default" issue has been presented for adjudication in this case.  Last December, the undersigned entered an Order (doc. 56) ruling on Accretive Health's Motion to Dismiss and, in the Alternative, for Summary Judgment (doc. 43).  That Motion asserted, *inter alia*, that (i) Church had failed to state a plausible claim that her debt to Providence Hospital was in default, warranting dismissal under Rule 12(b)(6), and (ii) Accretive Health had submitted "undisputed facts" establishing that no such default had occurred.  On the former question, the Court concluded that the Amended Complaint contained "a plausible factual predicate to support Church's allegation that the account was in default at the time of the transfer, so as to render Accretive a debt collector for FDCPA purposes."  (Doc. 56, at 7.)  On the latter question, the Court held that summary judgment was improper pursuant to Rule 56(d) because "[t]o force Church to go forward with summary judgment now would be unfair because it would deprive her of the tools and information she reasonably requires to prepare her opposition."  (*Id.* at 24.)  After a vigorous discovery period, Accretive Health has renewed its Motion for Summary Judgment, contending that undisputed record facts establish that Church's debt was not in default at the time Providence Hospital transferred it to Accretive Health, such

that the FDCPA is inapplicable and no FDCPA disclosures were necessary in the solitary letter at issue herein.

      **B.**     ***Plaintiff's Dealings with Providence Hospital and Accretive Health.***

The relevant facts are, in large part, undisputed and uncontroversial. In late 2012, plaintiff, Mahala Church, was scheduled for an inpatient surgical procedure at Providence Hospital in Mobile, Alabama. (Church Dep. (doc. 94, Exh. T), at 22.) Because of the nature of her medical condition, Church underwent a regimen of preoperative treatment at Providence on multiple occasions in November 2012, then returned to the hospital for surgery on December 18, 2012. (*Id.* at 22-24.) At the time she received this medical care, Church was covered by two complementary forms of insurance, namely Medicare Part A and a BlueCross/BlueShield C+ Supplement. (*Id.* at 21.) Church had carefully planned the timing of her surgery to occur before the end of the calendar year so that her insurance would cover it completely, with no deductible payment required. (*Id.* at 28-29.) Consequently, Church did not expect to make any out-of-pocket payments for this course of treatment, including both preoperative care and surgery. (*Id.* at 29.)

Upon her discharge from Providence, Church was neither presented with a bill nor asked to make any payment. (*Id.* at 25-26.) Instead, Church received what is called a "courtesy discharge," because the hospital anticipated that insurance would cover the balance owed for her medical care. (Bragg Dep. (doc. 94, Exh. B), at 22.) That is, Providence did not pursue payment arrangements with Church at the time of her discharge because hospital officials expected that there would be no remaining balance after payment by insurance. (*Id.* at 69-70, 98.) In fact, Providence <u>never</u> sent Church a bill and never contacted her directly to collect on her account. (Church Dep., at 26, 29.) Nonetheless, Providence assigned a balance of $31,724.66 to plaintiff's surgery. (Doc. 94, Exh. E.) Over the next few weeks, after Medicare allowances and associated insurance payments, that balance was reduced to $656 as of early February 2013. (*Id.*; Bragg Dep., at 80.)

For her part, Church was on the cusp of filing for bankruptcy protection for reasons unrelated to her late-2012 medical treatment at Providence. While she understood that her December 2012 surgery and related care would be fully covered by insurance, Church also believed she owed Providence money for "something else" (*i.e.*, for previous medical treatment unrelated to the December 2012 surgery). (Church Dep., at 29-30.) So Church initiated contact

with Providence's business office in February 2013 to inquire about the status of those other charges.  (*Id.* at 29-31.)  At that time, Providence notified her for the first time that her account for the December 2012 surgery had an outstanding balance of $656.  (*Id.* at 31; doc. 94, Exh. E.)

On June 7, 2013, Church filed a Voluntary Petition under Chapter 7 in the U.S. Bankruptcy Court for the Southern District of Alabama.  (Doc. 94, Exh. X.)  In her bankruptcy schedules, Church listed Providence as a creditor, with a balance owed of $656.  (*Id.* at 29; Church Dep., at 35.)  Unbeknownst to Church, however, two days earlier Providence had unilaterally cancelled that $656 balance and zeroed out her account for the December 2012 surgery as part of BlueCross's contractual allowance.  (Doc. 94, Exh. E.; Bragg Dep., at 85-86.)  In point of fact, then, Church owed no money to Providence for the December 2012 surgery at the time she filed her Chapter 7 petition.  Be that as it may, the Bankruptcy Court granted Church a discharge pursuant to 11 U.S.C. § 727 on September 9, 2013.  (Doc. 94, Exh. Z.)

On January 10, 2014, some four months after Church's discharge in bankruptcy, a Providence employee observed that, while Church's surgery account had a zero balance, a separate account for Church's preoperative lab charges incurred in November 2012 (in preparation for the December surgery) still showed an outstanding balance "pending insurance." (Doc. 94, Exh. V.)  At that time, Providence combined the two accounts into one, thereby reactivating Church's account and showing a balance owed.  (Bragg Dep., at 31-33, 81, 85 and 98; doc. 94, Exh. E; Graves Dep., at 99.)  For reasons not germane to the claims joined here, Providence (or, more accurately, Providence's automated systems) did not recognize that Church had received a discharge in bankruptcy back in September 2013.  Ultimately, a letter was generated by a third party seeking payment of what Providence's records showed to be an unpaid balance of $1,944.80 on Church's account.  (*Id.* at 32-33.)  Those charges related exclusively to the November 2012 lab work performed antecedent to Church's surgery.  (Bragg Dep., at 99-100.)  Church had never previously been billed by Providence Hospital for those outstanding amounts.  (Church Dep., at 23, 25-26.)

The net result of the foregoing chain of events was that Church received a collection letter dated January 17, 2014.  That single, one-page item of correspondence is the *raison d'être* for this litigation.  The letter was sent by defendant, Accretive Health, Inc., and listed the sender

as "Medical Financial Solutions, a Division of Accretive Health."  (Doc. 102, Exh. B.)[5]  The

letter reflected a date of service of December 18, 2012, a balance owed of $1,944.80, and a due

date of "UPON RECEIPT."  (*Id.*)  The January 17 letter read, in its entirety, as follows:

> "Dear MAHALA CHURCH,
>
> "You have an active balance of $1,944.80 with Providence Hospital.  To assist you in resolving this balance, Providence Hospital has sent your account to Medical Financial Solutions.  It is very important we hear from you.
>
> "The hospital values you as a patient and would like to help you resolve this unpaid balance.  If you are unable to remit payment in full at this time, please contact Medical Financial Solutions to discuss resolution options that may be available to you:
>
> - Payment Arrangement
> - Apply Insurance
> - Financial Assistance
>
> "Please call **Medical Financial Solutions at 251-631-3550** or remit payment using the payment coupon above.  Our office hours are listed at the bottom of this letter.  If payment in full was sent before the date of this letter, please disregard this request and accept our gratitude.
>
> "If this balance presents a financial hardship to you or your family, there are programs available to help.  Please call the number above to find out more.
>
> "Sincerely,
>
> "Medical Financial Solutions
>
> *"Medical Financial Solutions is a non-credit reporting, third party agency.  Our company works directly with Providence Hospital to ensure your account is protected from moving further into collections.*
>
> "Inbound and outbound calls may be monitored or recorded for quality purposes."

(Doc. 102, Exh. B.)  Everyone agrees that the January 17 letter did not contain certain

disclosures mandated by the FDCPA, specifically 15 U.S.C. §§ 1692e and 1692g.[6]

---

[5]     Although the January 17 letter nominally originated from Accretive Health, in fact it was generated and mailed by an Accretive Health vendor called Rev Spring.  (Graves Dep., at 21; Bragg Dep., at 32-33.)  This appears to have been an entirely automated process.

[6]     In particular, nowhere did Accretive Health expressly state that the letter was sent by a "debt collector … attempting to collect a debt and that any information obtained will be used for that purpose."  15 U.S.C. § 1692e(11).  "This warning is sometimes referred to as the 'mini-Miranda.'"  *Townsend v. Quantum3 Group, LLC*, 535 B.R. 415, 420 (M.D. Fla. 2015) (citation omitted).  Nor did the letter, or any follow-up correspondence from Accretive Health, alert Church that "unless the consumer, within thirty days after receipt of notice, disputes the (Continued)

Prior to receiving the January 17 letter, Church had never heard of Medical Financial Solutions or Accretive Health, and had never interacted with or been contacted by those entities. (Church Dep., at 41; Graves Dep., at 74.)  Upon reviewing the letter, Church surmised that its purpose was "[t]o collect money" on a medical debt, and that the sender was not "a consumer protections agency" trying to help her.  (Church Dep., at 41-42.)  She construed the letter as an indication that Providence had "turned me over to a collection agency."  (*Id.* at 42.)  Church was "very angry and very emotional" to receive the letter.  (*Id.* at 85.)  She "cried a lot when this happened" and "felt like [her] world crashed that day."  (*Id.*)  So Church notified her bankruptcy attorney.  (*Id.* at 44.)  She also called Providence Hospital's business office to inform them that she owed no money on the subject account; however, the business office representative responded that Church actually did owe a deductible for the December 2012 surgery.  (*Id.* at 46.)  Church did not contact Accretive Health.  (*Id.* at 45.)  The January 17 letter marked the entirety of Church's interactions with Accretive Health concerning the subject debt.  Less than a month later, on February 11, 2014, Church filed suit against Accretive Health alleging, *inter alia*, violations of the FDCPA.  (*See* doc. 1.)

By way of postscript, the outstanding charges on Church's account were finally resolved on April 23, 2014, when Providence Hospital "took the 1,944 and adjusted it to the Medicare allowance."  (Graves Dep. (doc. 94, Exh. J), at 105; doc. 94, Exh. E.)  To be clear, Providence received no additional payment from Medicare, Church or anyone else; however, as a matter of its contract with Medicare, "[t]hese charges should have been included in what Providence Hospital initially billed to Medicare," so they were written off as an allowance.  (Graves Dep., at 105.)  Aside from the January 17 letter, neither Providence nor Accretive Health made any attempt to collect all or part of the $1,944.80 balance from Church at any time.

---

validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector;" that if Church notified Accretive Health in writing "within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment;" or that if Church made a written request within 30 days, Accretive Health "will provide the consumer with the name and address of the original creditor."  15 U.S.C. § 1692g(a)(3)-(5).

### C.   *Providence Hospital's Policies and Practices Concerning Unpaid Debts.*

While the foregoing describes the sum total of Church's dealings with Accretive and Providence Hospital giving rise to her FDCPA claims, the narrow legal issue presented on summary judgment requires examination of Providence's practices and policies concerning patient accounts with outstanding balances.

As a matter of Providence's written policy, the patient's portion of a bill is due at the time of service.  (Bragg Dep., at 53-54, 64-65. 69-70.)  Indeed, a form given to patients *before* inpatient procedures specifically states, "The patient's portion of the bill is due a [*sic*] the time of service.  We accept Visa, Mastercard, American Express and Discover cards.  We also can arrange a loan with a local bank."  (Doc. 102, Exh. C, at 37.)[7]  As a practical matter, where insurance coverage is involved, Providence sends the patient a bill only after it ascertains the patient portion (*i.e.*, which charges insurance will not cover).  (Bragg Dep., at 43-44.)  Where a patient's insurance appears to provide full coverage, Providence does not and would not expect any payment from the patient at the time of service.  (*Id.* at 102-03.)

If Providence sends a bill to the patient and she does not pay, then Providence's practice is to follow up by sending another bill the following month.  (Bragg Dep., at 44.)  If, after 60 days and two billing statements to the patient, a balance remains outstanding, then Providence's automated system would change the account's financial classification from an A to an I.  (*Id.* at 45-46, 101.)  Even with an "I" status, the patient account is still considered "an active open AR [Accounts Receivable] account" at Providence, and is treated as neither bad debt nor defaulted debt.  (Bragg Dep., at 46; Graves Dep. (doc. 94, Exh. J), at 118.)

What does change with the transition from A to I financial class status, however, is that Accretive Health becomes involved.  (Graves Dep., at 114-15.)  Accretive Health provides "revenue cycle management services" to Providence, including "pre-collection of unpaid and

---

[7]      This point is echoed by Providence's Policy & Procedure Manuals, which state, "All patient balances are due and payable in full at the time of service (Emergency Room or Outpatient) or at the time of patient discharge (Inpatient)."  (Doc. 102, Exh. C, at 39.)  Such Manuals further specify that "[u]pon discharge, the patient and/or guarantor should be asked for payment of the balance due in full."  (*Id.* at 40 & 41.)  And the Manuals reflect that "[t]he patient Accounts Representative will exhaust every effort to collect any balance due at discharge."  (Doc. 102, Exh. D.)

outstanding patient account balances." (Bragg Aff. (doc. 92, Exh. A), ¶¶ 2-3.)[8]  Pre-collection activities are designed to "collect unpaid and outstanding patient account balances that are in the current hospital accounts receivable and have not yet been placed with a collection agency. These are active open accounts not yet in default." (Id., ¶ 3.)  When a patient account is assigned from Providence to Accretive Health, the account enters the latter's work flow for "early-out" services.  This means that Accretive Health performs the same functions that Providence's business office performs, and does so from a shared service environment.  (Graves Dep., at 38.) Thus, Accretive Health does "all the things a business office would do while the account is still on the active AR, but after, usually, the hospital sent … two statements or waited 60 days." (Id. at 39.)[9]  This involves "collection of active AR accounts that have gone unpaid for, usually, 60 days that we try to help resolve in any way we can." (Id. at 38-39.)  During this process, the account remains active on Providence's accounts receivable ledger, physically at Providence, and accessible to Providence, with the only difference being that it is assigned to Accretive Health for servicing using a shared system.  (Bragg Dep., at 34.)

Upon assignment of an account, Accretive Health performs pre-collection services in an attempt to obtain payment of the unpaid account balance.  Typically, Accretive Health sends multiple billing statements to the patient, and otherwise works directly with the patient, the insurance company, the hospital and others to try to resolve the balance.  (Graves Dep., at 65, 116.)  If such efforts do not succeed after some period of time, then Accretive Health notifies Providence and recommends reclassification of the account from "active" to "bad debt."  (Bragg

---

[8]     Accretive Health's literature defines a "revenue cycle" as "the process by which charges are generated and payments are collected for an organization.  It includes revenue, such as insurance payments and adjustments, patient payments, and financial assistance programs." (Doc. 94, Exh. N, at 2.)

[9]     Donna Bragg, the Director of Providence Hospital's Business Office, echoed this sentiment, testifying that Accretive Health "does the same thing we do, they just do it after 60 days."  (Bragg Dep., at 33.)  As she put it, "they're doing the same thing, we're both doing the same thing."  (Id. at 39-40.)  Later in her deposition, Bragg reiterated that Accretive Health "works with us as an extended business office. … They do the same thing we do, it's just they start working it and we're back on our other accounts."  (Id. at 107-08.)

Aff., ¶ 7; Bragg Dep., at 56.)[10]  If Providence accepts that recommendation, then the unpaid account is reclassified as "bad debt" on the hospital's financial records and is considered in default.  (Bragg Aff., ¶ 7.)[11]  As a matter of Providence written policy, an account becomes bad debt when the hospital or Accretive Health "has exhausted all possible collection efforts and determined that the account is uncollectible or that the account should be referred to a commercial collection agency."  (Doc. 94, Exh. P.)[12]  At that point, Accretive Health's involvement comes to an end, and Providence refers the "bad debt" account to a third-party primary collection agency, either AMCOL or ACSI.  (Bragg Aff., ¶ 8; Bragg Dep., at 38-39.) Providence does not consider an account to be "bad debt" until it is actually placed with a collection agency, after Accretive Health's work is concluded.  (Bragg Dep., at 97.)  As of January 2014, Accretive Health did not collect any Providence accounts that had been classified by the hospital as "bad debt" or in default.  (Graves Dep., at 53-54.)  And Providence's policy has "always" been that "we don't consider an account in default until we determine it's uncollectible," which coincides with the point at which it is reclassified as bad debt.  (Bragg Dep., at 101-02.)

Applying these procedures to Church, defendant's evidence is that her account was not in default when Accretive Health mailed the January 17 letter to her.  (Bragg Dep., at 97-98.) According to defendant's evidence, that account had only been reactivated for seven days at the time the letter was sent; moreover, Church had not previously been billed for those amounts

---

[10]     There is no hard-and-fast rule dictating when Accretive Health and Providence decide that an account is to be reclassified as bad debt.  Ordinarily, Accretive Health will keep the account for a minimum of 90 days.  (Graves Dep., at 57.)  Once Accretive Health and Providence "feel like we have taken every attempt to collect it," then the account may be placed into bad debt and referred to one of Providence's external collection agencies.  (*Id.*)

[11]     Accretive Health likewise "define[s] the point of default to be once the account has entered – has become a bad debt in the hospital's accounting system, yes."  (Graves Dep., at 86.)  Defendant's Rule 30(b)(6) witness testified that "[b]ad debt means the same as default to Accretive Health."  (*Id.* at 112.)

[12]     The phrase "all possible collection efforts," read in context, would not encompass judicial or garnishment proceedings.  Indeed, the same written policy specifies that "[a]ny file placed with a collection agency or collection attorney will require additional approval for garnishment or suit request. … The suit request must be signed by Executive Hospital Management or their designee."  (Doc. 94, Exh. P, at 3.)

-12-

because everyone expected that her two forms of insurance (Medicare and BlueCross/ BlueShield) would cover the entire balance.  (*Id.* at 98.)  Church's account moved into Accretive Health's work flow on January 12, 2014 because (i) it had been reactivated when Providence consolidated the pre-op account (which still showed a balance pending insurance) with the zero-balance surgery account on January 10, 2014; (ii) the balance had been outstanding for more than 60 days (in that the medical services in question had been rendered in November 2012); and (iii) the account moved from Class A to Class I.  The referral to Accretive Health's work flow was automated, and resulted in the letter being generated five days later.  (Graves Dep., at 104.) Church's account remained active and accessible on Providence's books even after being assigned to Accretive Health.  (Bragg Dep., at 34.)  And Providence Hospital never considered Church's account to be in default or to be "bad debt."  (Bragg Aff., ¶ 11.)

### III.    Summary Judgment Standard.

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a), Fed.R.Civ.P.  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."  *Id.*  (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations."  *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

## IV.     Analysis.

### A.     *The FDCPA Statutory Scheme: Necessity of Default.*

Notwithstanding the extensive briefing and hundreds of pages of exhibits submitted on summary judgment, the parties' dispute boils down to a discrete, singular question, namely, whether Church's account with Providence Hospital was in default upon assignment to Accretive Health.  Here is why:  As noted, Church's only claim is that Accretive Health violated the FDCPA by omitting from the January 17 letter certain disclosures required by 15 U.S.C. §§ 1692e and 1692g.  It is not – and cannot reasonably be – contested that the January 17 letter, in fact, lacked those FDCPA disclosures.  Accretive Health's position, however, is that it had no FDCPA disclosure obligations in the January 17 letter because the statute does not apply.

On their face, both § 1692e and § 1692g regulate only the conduct of "debt collectors." *See* 15 U.S.C. § 1692e (providing that "[a] debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt," and reciting the failure to make mini Miranda disclosures in initial communication as a violation); 15 U.S.C. § 1692g (mandating that, within five days after initial communication, "a debt collector shall … send the consumer a written notice" containing certain information).  The point is simple:  If Accretive is not a "debt collector," then its failure to include statutory disclosures in the January 17 letter to Church did not violate the FDCPA and Church's claims must be dismissed.  *See, e.g., Davidson v. Capital One Bank (USA), N.A.*, 797 F.3d 1309, 1313 (11th Cir. 2015) ("There is no dispute that § 1692e applies only to debt collectors.").[13]

Unsurprisingly, "[a] 'debt collector' is a term of art in the FDCPA."  *Ausar-El ex rel. Small, Jr. v. BAC (Bank of America) Home Loans Servicing LP*, 448 Fed.Appx. 1, 2 (11th Cir. Sept. 21, 2011).  The statutory definition of "debt collector" sets forth more than a half dozen exclusions, only one of which is invoked by defendant here.  The relevant exclusion states that the term "debt collector," as used in the FDCPA, does not include "any person collecting or

---

[13]     *See also Milijkovic v. Shafritz and Dinkin, P.A.*, 791 F.3d 1291, 1297 (11th Cir. 2015) ("The FDCPA regulates what debt collectors can do in collecting debts."); *Harris v. Liberty Community Management, Inc.*, 702 F.3d 1298, 1302 (11th Cir. 2012) (observing that "[t]he Act's restrictions apply only to 'debt collectors,'" as defined in the statute); *White v. Bank of America Bank, NA*, 597 Fed.Appx. 1015, 1020 (11th Cir. Dec. 29, 2014) ("The FDCPA imposes civil liability on 'debt collectors' for certain prohibited debt-collection practices.").

attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity … ***concerns a debt which was not in default at the time was obtained by such person***." 15 U.S.C. § 1692a(6)(F)(iii) (emphasis added). Thus, a defendant is not a debt collector for FDCPA purposes – and is not obliged to make FDCPA disclosures to a consumer – if the debt being collected was not in default at the time the defendant obtained it. *See Davidson*, 797 F.3d at 1314 ("Subsection (F)(iii) excludes any person who is collecting or attempting to collect on any debt owed or due another from the term 'debt collector' *if* the debt was not in default at the time it was acquired."); *Fenello v. Bank of America, NA*, 577 Fed.Appx. 899, 902 (11th Cir. Aug. 12, 2014) ("the district court correctly concluded that Bank of America was not a 'debt collector' for purposes of § 1692g(b) because its debt collection activities involved a debt that was not in default at the time Bank of America became the servicer").

The critical, dispositive question in this case, then, is whether Church's debt to Providence Hospital was "in default" when it was assigned to Accretive Health. *See Ruth v. Triumph Partnerships*, 577 F.3d 790, 796 (7th Cir. 2009) ("Where, as here, the party seeking to collect a debt did not originate it but instead acquired it from another party, we have held that the party's status under the FDCPA turns on whether the debt was in default at the time it was acquired."). The trick lies in the determination of whether a particular debt was in default. Regrettably, the term "default" is not defined in the FDCPA, leaving courts to apply the statute without congressional guidance as to the meaning of this pivotal term. In practice, where a contract between the originating creditor and the consumer delineates when the account will be deemed defaulted, or where some other applicable statute or regulation fixes the precise moment of default, courts have generally held that such agreements or legal provisions dictate when an account is "in default" for FDCPA purposes. However, where (as here) no such agreement or governing regulation exists or has been identified by the parties, the analysis becomes more complicated. *See, e.g., Simmons v. Med-I-Claims*, 2007 WL 486879, *7 (C.D. Ill. Feb. 9, 2007) ("[W]here there is no relevant contractual provision … nor any governing regulation, courts have struggled to establish when a debt is in default for purposes of … determining whether a party is a debt collector under the FDCPA.").

That said, a helpful body of precedent developing useful principles for the FDCPA "default" analysis has emerged, and the Court finds such authorities instructive here. For example, "[i]n applying the FDCPA, courts have repeatedly distinguished between a debt that is

in default and a debt that is merely outstanding, emphasizing that only after some period of time does an outstanding debt go into default." *Alibrandi v. Financial Outsourcing Services, Inc.*, 333 F.3d 82, 87 (2nd Cir. 2003) (citation and footnote omitted). Thus, case law rejects the proposition "that default occurs *immediately* after a debt becomes due." *Id.*; *see also Hamilton v. Avectus Health Care Solutions, LLC*, 2015 WL 5693610, *8 (N.D. Ala. Sept. 29, 2015) (rejecting notion that "outstanding" and "in default" are synonymous under the FDCPA). Indeed, "[t]he Act's legislative history is consistent with construing 'in default' to mean a debt that is at least delinquent, and sometimes more than overdue." *De Dios v. International Realty & Investments*, 641 F.3d 1071, 1075 n.3 (9th Cir. 2011). Additionally, courts (and the parties in this case) have recognized that "in the absence of a contractual definition or conclusive state or federal law, a creditor's reasonable, written guidelines may be used to determine when an account is 'in default,'" including such factors as "whether the guidelines are applied consistently and whether they are designed for administering accounts, rather than for circumventing the FDCPA." *Prince v. NCO Financial Services, Inc.*, 346 F. Supp.2d 744, 747 (E.D. Penn. 2004) (citation omitted); *see also Bohringer v. Bayview Loan Servicing, LLC*, --- F. Supp.3d ----, 2015 WL 6561419, *6 (S.D. Fla. Sept. 10, 2015) (creditor's written guidelines may be considered in determining whether debt is "in default" for FDCPA purposes).[14] Ultimately, "the determination of whether a debt is in default [for purposes of the FDCPA] is to be made by a court on a case-by-case basis." *Hamilton*, 2015 WL 5693610, at *8 (citations omitted).[15]

The Court also bears in mind that the reasoning underlying the "not in default" exception to FDCPA coverage is as follows: "If the loan is current when it is acquired, the relationship between the assignee and the debtor is, for purposes of regulating communications and collections practices, effectively the same as that between originator and the debtor. If the loan

---

[14]     To illustrate the "circumvention" factor, an originating creditor's policies that allow the creditor to transfer the loan to a third party for servicing one day, then declare it to be in default the next day in order to avoid FDCPA regulation, would not be entitled to any weight. *See generally Magee v. AllianceOne, Ltd.*, 487 F. Supp.2d 1024, 1027-28 (S.D. Ind. 2007); *Church v. Accretive Health, Inc.*, 2014 WL 7184340, *6 (S.D. Ala. Dec. 16, 2014) ("the law is clear that a third-party agency like Accretive has no power unilaterally to recharacterize a debt's status into something it is not in order to remove it from the ambit of the FDCPA").

[15]     *See also Bohringer*, 2015 WL 6561419, at *6; *Church*, 2014 WL 7184340, at *3.

is in default, no ongoing relationship is likely and the only activity will be collection." *F.T.C. v. Check Investors, Inc.*, 502 F.3d 159, 174 (3rd Cir. 2007) (quoting *Schlosser v. Fairbanks Capital Corp.*, 323 F.3d 534, 538 (7th Cir. 2003)); *see also Ruth*, 577 F.3d at 797 ("The purchaser of an already-defaulted debt – like the debt collector, and unlike the originator and servicer of a non-defaulted debt – has no ongoing relationship with the debtor and, therefore, no incentive to engender good will by treating the debtor with honesty and respect.").

> **B.      *Whether Defendant was a "Debt Collector" for FDCPA Purposes.***

> *1.      Record Evidence Establishes that Plaintiff's Account was not in Default.*

There is no dispute that Accretive Health "obtained" Church's debt with Providence Hospital on or about January 12, 2014, when her account first moved into Accretive Health's work flow. *See, e.g., Carter v. AMC, LLC*, 645 F.3d 840, 844 (7th Cir. 2011) ("A servicing agent 'obtains' a debt in the sense that it acquires the authority to collect the money on behalf of another."). As such, the only question presented on summary judgment is whether Church's account was in default at that time.

Examining all record facts and circumstances, the Court finds that Accretive Health has made a compelling showing that Church's debt to Providence was not in default as of January 12, 2014. At that time, neither Providence nor anyone else had ever sent Church a bill or otherwise contacted her to request or demand that she pay that debt. No one at Providence had ever told Church either (i) that she owed anything for the November 2012 preoperative medical care, or (ii) what the amount outstanding was. It would defy logic, reason, and common sense for a consumer account to be classified as "in default' when the creditor had never previously sent a bill or otherwise contacted the consumer about the debt, and the consumer had no inkling of the amount, or even the existence of, the debt. Furthermore, uncontroverted record evidence establishes that Providence had reactivated Church's account on January 10, 2014, just two days before Accretive Health obtained the debt. It would be counterintuitive to the extreme for an account that had been active for only two days to be labeled "in default" for FDCPA purposes under any reasonable meaning of the term.

These common-sense observations are galvanized by consideration of record evidence concerning Providence Hospital's policies. Defendant's unchallenged evidence reveals that Providence has a three-step process for collecting debt from patients or guarantors after insurance has paid its portion. First, Providence attempts to collect the debt directly by sending

two monthly statements to the patient.  Second, if those billing statements are unsuccessful, then Providence reclassifies the account's financial class status from A to I, and assigns it to Accretive Health for "early-out" or pre-collection services, typically for a minimum of 90 days. During that period, Accretive Health performs the same activities that Providence does, and the account remains classified as an active account receivable on Providence's financial ledger. Third, if Accretive Health's pre-collection activities fail, if all possible collection efforts have been exhausted, and if Providence determines that the account is uncollectible, then the hospital reclassifies the account as bad debt and refers it to an outside commercial collection agency (not Accretive Health) with no further involvement from Accretive Health.  The longstanding policy and practice of Providence is that an account is not deemed "in default" until it is determined to be uncollectible and is classified as "bad debt" in the hospital's accounting system.  Record facts establish that Church's account had just barely reached the second stage of this three-step process (after skipping the first one); therefore, as a matter of Providence policy and procedure, that account could not have been "in default" when it was first assigned to Accretive Health.  All collection efforts had not been exhausted at that time; to the contrary, no collection efforts had even been initiated.  The January 17 letter marked the first collection effort directed at Church by anyone at any time vis a vis the subject account.  As of January 12, hospital business office representatives had not reviewed Church's account, deemed it uncollectible, or taken any steps to refer it to a collection agency.  That account still was listed as an active AR account on Providence's financial books.  All of these facts and circumstances are flatly inconsistent with the notion that Church's account was "in default" as of January 12, 2014, when it was first assigned to Accretive Health.

Further reinforcement of this conclusion may be found by reviewing Accretive Health's role in Providence's debt collection process, juxtaposed against the purposes animating the FDCPA statutory scheme.  Recall that the "not in default" exemption is rooted in the distinction between originators of debt (who are likely to have an ongoing relationship with the consumer with a concomitant incentive to engender good will) and debt collectors (who have no such ongoing relationship with the consumer and no accompanying incentive – absent regulation – to treat the consumer with dignity and respect).  All record facts before the Court establish that Accretive Health was closely aligned with Providence in performing pre-collection activities. The two entities worked from a shared system, with the account remaining at all times physically

housed at Providence on Providence's books as an active, open account.  The hospital's business office director described Accretive Health as acting as Providence's "extended business office," with consultation between them as to when pre-collection activities should stop and the account should be moved to bad debt.  The January 17 letter itself explained that Accretive Health "works directly with Providence Hospital," and reassured Church that "[t]he hospital values you as a patient and would like to help you resolve this unpaid balance."  Thus, Accretive Health was directly trading in the goodwill of Providence Hospital, portraying itself as an insider to the Providence – Church relationship, and holding itself out to Church as an extension of the hospital.  Looking at the purposes of the "in default" requirement for FDCPA disclosures, the undersigned is of the opinion that they would not be advanced by deeming Accretive Health to be subject to the FDCPA's restrictions here.  Operating as an "extended business office" for Providence Hospital, and holding itself out as an extension of the hospital itself, Accretive Health already had every incentive to treat consumers with dignity and respect so as to preserve and foster those consumers' ongoing relationships with Providence.  There was no need for statutory compulsion to force Accretive Health to treat Church respectfully and fairly.  Under the circumstances, Accretive Health was much more closely aligned with the status of a debt originator than that of a debt collector; therefore, the FDCPA's statutory purposes would not be promoted by regulating Accretive Health's conduct in the January 17 letter.

In the aggregate, then, the summary judgment record weaves a highly persuasive narrative that Accretive Health is not a debt collector for FDCPA purposes because the challenged collection activity (*i.e.*, sending a single letter to Church on January 17, 2014) in this case concerns a debt that was not in default when Accretive Health obtained it.  As of that time, Church had never been billed for the debt, Providence had made no attempt to collect it, and the account had been active for just two days.  Although the debt was outstanding, it cannot reasonably be viewed on these facts to have been in default.  Additionally, Providence's policies and procedures would not and did not classify Church's account as being in default at the time of the January 12 assignment to Accretive's workflow queue.  And Accretive's hand-in-hand relationship with Providence Hospital renders it much more akin to an originator (as to whom FDCPA restrictions do not apply) than a debt collector (as to whom they do).

2. *Plaintiff's Counterarguments are Unavailing.*

Faced with this formidable collection of record facts favoring summary judgment for defendant, Church has the daunting task of identifying genuine issues of material fact as to whether her account was "in default," such that denial of Accretive Health's Rule 56 Motion might be warranted.  She advances three categories of arguments in an effort to do so.

First, Church posits that Accretive Health's evidence equating "bad debt" to "in default" at Providence Hospital is nowhere reflected in the hospital's written policies, and that the testimony of Providence's Business Office Director, Donna Bragg, to that effect should be discounted because she merely "parroted Accretive's legal position."  (Doc. 102, at 14.)[16] Plaintiff is correct that Providence's written policies are couched in the language of "bad debt," without delineating a precise moment in time at which an account becomes "in default." However, that omission is inconsequential for the summary judgment analysis.  Despite extensive discovery and exhaustive production and review of Providence's written policies and procedures, plaintiff has identified not a shred of evidence that is inconsistent with, or that tends to rebut or cast doubt on, Bragg's testimony that the hospital has always equated "bad debt" with "in default," and has never deemed a patient account to be in default until designating it "bad debt."  Insofar as plaintiff urges the Court categorically to reject Bragg's testimony concerning hospital practices and policies because such testimony is not entirely duplicative of (and captured within) the four corners of Providence's written policy manuals, this argument also fails.  Courts in FDCPA cases have considered testimony – not just written policies – by a debt originator in evaluating whether a specific debt was in default at the time it was obtained by the defendant. The Court is aware of no persuasive reason favoring categorical rejection of witness testimony concerning unwritten policies or practices of a debt originator.[17]

---

[16]      Of course, summary judgment is not the appropriate time to weigh a witness's credibility.  *See, e.g., Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) ("It is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment.").  Therefore, the Court declines any invitation to do so with respect to witness Bragg's testimony.

[17]      In this section of her brief, Church suggests that Accretive Health's inclusion of FDCPA disclosures in pre-collection letters transmitted to other consumers is somehow probative of its status as a debt collector covered by the FDCPA here.  (Doc. 92, at 15.)  Case law is clear, however, that a servicer not otherwise within the ambit of the statutory definition of (Continued)

Second, Church asserts that even if defendant's evidence that Providence equated "default" with "bad debt" is accepted, such a formulation is unreasonable (because it conflates a legal term with an accounting term), makes no sense (because it implies that an account is not in default until "all possible collection efforts are exhausted"), and conflicts with the FDCPA. (Doc. 102, at 15-17.)  None of these contentions are persuasive.[18]

As to reasonableness, it is up to Providence Hospital (as originator of the debt) to promulgate policies establishing when an outstanding patient account is deemed "in default." Whether plaintiff, this Court or anyone else agrees with those policies – or would have adopted different policies if standing in Providence's shoes – is of no moment.  We are not here to sit in

―――――――――――――――

"debt collector" does not thereby become a debt collector simply by calling itself one or abiding by statutory requirements applicable to debt collectors.  *See, e.g., Saint Vil v. Perimeter Mortg. Funding Corp.*, --- Fed.Appx. ----, 2015 WL 6575814, *2 (11th Cir. Oct. 30, 2015) ("The question in deciding whether a law firm acted as a debt collector is not simply what the firm called itself but rather ***whether the firm acted as a debt collector as that term is defined by the statute***.") (emphasis added); *Fenello*, 577 Fed.Appx. at 902 ("An entity cannot transform itself into a 'debt collector' within the meaning of the FDCPA simply by noting in a letter that it may be considered one under the Act."); *Moore v. PNC Mortgage, N.A.*, 2015 WL 402264, *2 (S.D. Ga. Jan. 28, 2015) ("even if the servicer calls itself a collector, FDCPA plaintiffs must still plead that the debt was in default when the servicer began to service it").  To the extent, then, that plaintiff would derive a genuine issue of material fact from Accretive Health's voluntary compliance with FDCPA disclosure requirements in other pre-collection letters sent to other consumers, such an argument fails as a matter of law.

18      Fundamentally, these arguments (as well as Church's point that the hospital's written policies do not expressly equate default with bad debt) cannot carry the day because, in some sense, they address the wrong question.  The crucial issue in this case is not whether, in the abstract, a patient account at Providence Hospital should be declared "in default" at the moment the account is written off as "bad debt."  Rather, the singular issue on which defendant's Motion for Summary Judgment turns is whether Church's account was in default on January 12, 2014, when it entered Accretive Health's work queue through the shared system.  As already stated *supra*, no genuine issue of material fact exists on this point because undisputed record facts establish that Providence had never billed Church for any amount on that account, the account had been activated only two days earlier, the account was still listed as an active AR account on Providence's accounts receivable ledger, and Accretive Health was acting as an extended business office of, and working directly with, Providence to service Church's account.  Given these facts, even if plaintiff's critiques of Providence's policy treating an account as "in default" only when it was shifted to "bad debt" were meritorious, such a victory would be pyrrhic because plaintiff still has not identified any genuine issues of material fact as to whether Church's account was "in default" on January 12, 2014.  It was not.

judgment of Providence's accounting practices or policies, or to ponder how a prudent or enlightened hospital might have structured those practices or policies differently. At any rate, the undersigned perceives nothing unreasonable about an organizational practice of considering an account to be in default at the time such account is taken off the active accounts receivable ledger, reclassified as "bad debt," and referred to an outside collection agency. Certainly, nothing about that policy appears designed to circumvent or thwart the FDCPA.

As to whether equating "default" and "bad debt" makes sense, Church argues that it does not because Providence's written policies provide that an account becomes "bad debt" only after the hospital or Accretive "has exhausted all possible collection efforts and determined that the account is uncollectible or that the account should be referred to a commercial collection agency." (Doc. 94, Exh. P.) Plaintiff reasons that it cannot be true that an account is not "in default" until after the servicer had "exhausted all possible collection efforts," inasmuch as "all possible collection efforts" would necessarily include litigation, which could not happen unless the debt were already in default. (Doc. 102, at 15.) This argument misses the mark because it distorts the phrase "all possible collection efforts" by excising it from the context of the written policy in which it is found. Reading that policy as a whole reveals that "all possible collection efforts" expressly do <u>not</u> include litigation which, the policy specifies, occurs only <u>after</u> referral to a third-party collection agency (*i.e.*, after the debt has attained "bad debt" status) and after approval from Executive Hospital Management. (Doc. 94, Exh. P.) Thus, plaintiff's argument that it makes no sense to equate "in default" with "bad debt" rests on an unreasonably literal reading of four words of a Providence written policy, divorced from the very context that defeats plaintiff's proposed construction.

As for plaintiff's contention that equating "in default" with "bad debt" conflicts with the FDCPA, the undersigned cannot agree. The discussion in Section IV.B.1., *supra*, demonstrates why it would be fully consistent with the purposes of the FDCPA to rule as a matter of law that Church's debt was not in default when Accretive Health obtained it. Nothing in Church's argument effectively rebuts that reasoning. To the contrary, plaintiff's suggestion that Providence's policy would allow "a collector or its client to wait until the end of the collections process to declare a debt in default" (doc. 102, at 16) misstates the facts. Church's account was not at "the end of the collections process." It was at the beginning, or even earlier. At the time that her account was assigned to Accretive Health's work queue, Church had not been billed

even one time, by anyone, for the subject account.  Even in a hypothetical "typical" case at Providence, an enormous amount of collection work remains to be done after the account is written off as "bad debt."  Moreover, plaintiff's cries of "manipulation" are misguided.  There is nothing manipulative about a policy distinguishing account servicing work done by a vendor that acts as an extension of the hospital's business office (which, again, is not the sort of activity that the FDCPA was designed to regulate) from collection work done by a third-party commercial collection agency after the hospital has written off the account as bad debt (which is exactly the sort of activity that the FDCPA was designed to regulate).

Third, plaintiff maintains that summary judgment is inappropriate because the point of "default" actually occurs "at or prior to the change of status to 'I' and referral to" Accretive Health.  (Doc. 92, at 17.)  Plaintiff reasons that altering the financial classification of an account from "A" to "I" and placing it in Accretive Health's work flow "coincides with a fundamental change in the status of the account," meaning that it must be in default.  (*Id.*)  Plaintiff cites no evidence for this proposition, and the facts before the Court belie her contention.  The summary judgment record unequivocally shows that modifying an account's status to "I" means only that Accretive Health will perform exactly the same debt-service work on the account that Providence Hospital had been performing previously, using a shared system.  These facts contradict plaintiff's characterization of the "I" reclassification as a "fundamental change."  Her argument seems to be that shifting account responsibilities from the originating creditor to a servicer must necessarily constitute a "fundamental change" meaning that a default has occurred; however, neither record facts nor the statutory framework itself supports such a construction.  Indeed, the FDCPA exemption at the heart of this lawsuit shows that Congress did not intend every transfer of an account from originator to servicer – evincing a "change in approach" by the originator – to be a FDCPA-triggering event.  Rather, as the statutory language makes clear, transfer of a non-defaulted debt to a servicer does not give rise to FDCPA coverage, even though it may well be symptomatic of a "change in approach" by the original creditor.  Plaintiff's argument would effectively write the exception out of the statute.

Besides, plaintiff's supporting rhetoric that "[b]y demanding payment and sending the account to a third party agency for collections, Providence certainly treated the debt as in default" and that the debt was "seriously past due after multiple demands for payment" (doc. 92, at 18-19) is counterfactual.  Once again, Providence never demanded payment from Church

before Accretive Health obtained the account.  Accretive Health is not a "third party agency for collections," but works directly with Providence as an extension of its business office, doing the same things Providence had been doing.  Even if the Court were to embrace plaintiff's premise that default "certainly occurs once the creditor demands a past-due amount and the debtor fails to timely pay" (*id.* at 18), summary judgment would remain appropriate here.  The record evidence is that the creditor did <u>not</u> demand a past-due amount from Church prior to the moment when Accretive Health obtained the account for FDCPA purposes.

For all of these reasons, the Court determines that plaintiff has failed to show any genuine issue of material fact on the question of whether her account was "in default" as of January 12, 2014.  On this record, no reasonable finder of fact could conclude that such a default existed.  Because Church's account was not in default at the time Accretive Health obtained it, defendant is not a debt collector for FDCPA purposes pursuant to the "not in default" exemption found at 15 U.S.C. § 1692a(6)(F)(iii).  Because Accretive Health was not a "debt collector" in relation to Church's debt, defendant was under no obligation to comply with FDCPA disclosures in its correspondence to Church dated January 17, 2014.  Because Accretive Health was not obligated to include such disclosures, its failure to do so cannot give rise to viable FDCPA claims predicated on failure to make those disclosures.  Accordingly, summary judgment is properly **granted** for Accretive Health as to all claims presented in the Second Amended Complaint.[19]

---

[19]      In so concluding, the Court does not endorse Accretive Health's argument, apparently presented for the first time in its reply brief, that it is immune from FDCPA liability because Church did not actually owe a balance to Providence Hospital.  (Doc. 106, at 11, 13-15.)  In other words, defendant relies on facts showing that Church's account was reactivated by mistake, that she did not actually owe money to Providence, and that the January 17 letter stemmed from an erroneous understanding that a balance remained outstanding on the account.  Plaintiff has the better argument on this point.  Multiple courts, including binding Circuit authority, have opined that a debt is in default under FDCPA if the servicer treats it as such, regardless of whether any debt was validly owed or not.  It is the servicer's treatment of the debt, rather than the debt's actual status, that matters.  *See, e.g., Davidson*, 797 F.3d at 1312 n.2 (opining that it is of no consequence whether debt was actually in default, and that where defendant "has treated [plaintiff's] debt as a debt that was in default at the time it was acquired … we will do the same"); *Bohringer*, 2015 WL 6561419, at *6 ("Even if a debt is not actually in default at the time its servicing rights are transferred to a loan servicer, the debt is nevertheless 'in default' under the FDCPA if the servicer treats the debt as in default at the time of transfer.") (citations omitted); *Salvato v. Ocwen Loan Servicing, LLC*, 2012 WL 3018051, *5 (S.D. Cal. July 24, 2012) ("It follows from the statutory scheme as a whole that such inquiry into whether (Continued)

## V.     Conclusion.

For all of the foregoing reasons, Defendant's Motion for Summary Judgment (doc. 91) is **granted**.   There being no genuine issues of material fact as to any claim or cause of action asserted herein, this action is **dismissed with prejudice**.  A separate judgment will enter. Defendant is **ordered** to file a supplemental memorandum in support of the pending Motions to Seal (docs. 93, 102, 105 and 109) on or before **December 8, 2015**.[20]

DONE and ORDERED this 24th day of November, 2015.

s/ WILLIAM H. STEELE

CHIEF UNITED STATES DISTRICT JUDGE

---

the debt is 'in default' at the time of assignment should not depend on whether the Court ultimately finds the underlying debt to be valid or invalid."). Thus, the fact that Providence and Accretive Health recognized some time after January 17 that Church owed nothing on the account is not relevant to the summary judgment analysis.

[20]     Plaintiff's Motion to Exclude New Evidence Filed with Reply Brief (doc. 108) is **denied**.  The challenged exhibits were properly submitted as rebuttal evidence in defendant's reply.  *See, e.g., Hammons v. Computer Programs and Systems, Inc. (CPSI)*, 2006 WL 3627117, *14 (S.D. Ala. Dec. 12, 2006) ("But nothing in the extant authorities, or in the Federal Rules of Civil Procedure, forbids a movant from making supplemental record submissions in a reply brief to rebut specific arguments raised by the non-movant's opposition brief.") (collecting cases); *see generally Sideridraulic System SpA v. Briese Schiffahrts GmbH & Co. KG*, 2011 WL 3204521, *2 n.4 (S.D. Ala. July 26, 2011) (observing that "a party properly submits supplemental exhibits with a reply brief to rebut arguments made in the nonmovant's response").  At any rate, Plaintiff's Motion to Exclude is much ado about nothing.  Simply put, the new exhibits do not materially affect the summary judgment analysis herein.  The Court's reasoning and conclusions on summary judgment would remain unchanged even if Exhibits JJ, KK, LL and MM were not part of the record.